**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WILMINGTON DIVISION**

IN RE:
WAYNE BAILEY, INC.,                                    CASE NO. 18-00284-5-SWH
                                                       CHAPTER 11
       DEBTOR.


**FIRST AMENDED DISCLOSURE STATEMENT**

**STUBBS & PERDUE, P.A.**
*COUNSEL FOR DEBTOR*

TRAWICK H. STUBBS, JR.
N.C. State Bar No. 4221
tstubbs@stubbsperdue.com

LAURIE B. BIGGS
N.C. State Bar No. 31845
lbiggs@stubbsperdue.com

9208 Falls of Neuse Road, Suite 201
Raleigh, North Carolina 27615
TEL:   (919) 870-6258
FAX:   (919) 870-6259

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:

WAYNE BAILEY, INC.,                          CASE NO. 18-00284-5-SWH
                                             CHAPTER 11

       DEBTOR.

### FIRST AMENDED DISCLOSURE STATEMENT

Pursuant to the provisions of Section 1125(b) of the Bankruptcy Code ("Code"), the Debtor hereby submits the following information:

### DISCLAIMER

THE INFORMATION CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED PLAN OF REORGANIZATION (the "PLAN OF REORGANIZATION") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OF REORGANIZATION.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OF REORGANIZATION OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OF REORGANIZATION.

ALL CREDITORS SHOULD READ THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN OF REORGANIZATION, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION. THE SUMMARIES, SYNOPSES, AND STATEMENTS OF THE PLAN OF REORGANIZATION MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN OF REORGANIZATION AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN OF REORGANIZATION.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.  THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR WITH "ADEQUATE INFORMATION," AS DEFINED IN § 1125 OF THE BANKRUPTCY CODE, SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN OF REORGANIZATION.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND RULE 408 OF THE NORTH CAROLINA RULES OF EVIDENCE, AS APPLICABLE TO ANY OF THE MATTERS SET FORTH HEREIN.   THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN OF REORGANIZATION ON HOLDERS OF CLAIMS AGAINST THE DEBTOR.

## ARTICLE I
## INTRODUCTION

CAPITALIZED TERMS NOT DEFINED HEREIN HAVE THE MEANING SET FORTH IN THE PLAN OF REORGANIZATION FILED BY THE DEBTOR AND/OR THE BANKRUPTCY CODE.

### A.  Purpose of This Document

The purpose of this Disclosure Statement is to provide each holder of a claim against the Debtor with adequate information about the Debtor and the Debtor's First Amended Plan of Reorganization (the "Plan") so that each holder of a claim may make an informed decision about whether to accept or reject the Plan.

***Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.***

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case;
- Who can vote on or object to the Plan;

-2-

- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
- Why the Debtor believes the Plan is feasible, and how the treatment of your Claim under the Plan compares to what you would receive on your claim in liquidation; and
- The effect of confirmation of the Plan.

The Plan describes:

- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim if the Plan is confirmed); and
- The classification of claims, and the treatment of the classes of claims, including a description of whether each class is Impaired or Unimpaired.

Be sure to read the Plan as well as the Disclosure Statement.  It is the Plan itself that will, if confirmed, establish your rights.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan.  This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.      *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will be scheduled by the Court and you will receive an Order setting forth the date, time and place.

2.      *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the Debtor's attorney. The Court will set deadlines for filing such objections.

3.      *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact the Debtor's attorney at the address shown on the first page of this Disclosure Statement.

<u>**ARTICLE II**</u>
**CLASSIFICATION AND TREATMENT OF CLASSES OF CLAIMS**

**The Plan, which accompanies this Disclosure Statement, is incorporated herein by reference.  Article IV of the Plan describes the classification of Claims and the treatment of**

**the Classes of Claims, including a description of whether each Class is Impaired or Unimpaired.**

THE PLAN CONTEMPLATES A REORGANIZATION OF THE DEBTOR'S OBLIGATIONS. IN ACCORDANCE WITH THE PLAN, THE DEBTOR INTENDS TO SATISFY CREDITOR CLAIMS FROM THE SALE OF ASSETS AND THE PURSUIT OF AVOIDANCE ACTIONS.

The particular method for payment of each creditor is outlined in Article IV of the Plan. All proceeds of any liquidation will be distributed in accordance with the priorities of the Code and as described more fully in Article V of the Plan. The general unsecured claims, including deficiency claims, as of the date of the filing of this Plan are set forth in Exhibit A hereto. The Debtor's liabilities will be paid according to the priorities of the Bankruptcy Code and the Orders of this Court. The specific amounts and terms of payment will be made according to the treatment of each respective creditor.

**A.      The Purpose of the Plan of Reorganization**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment that each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**B.      Administrative Expenses and Tax Claims**

The following types of claims are addressed in the Plan:

1.      *Administrative Costs*

Administrative costs are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses may also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.

2.      *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the Petition Date.

**C.      Classes of Claims**

The following classes are also addressed in the Plan. The Plan describes the proposed treatment that they will receive under the Plan:

-4-

1. *Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's Estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim. The specific classes are described in Article IV of the Plan.

2. *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a holder of a Priority Unsecured Claim may vote to accept a different treatment than that which is set forth in the Bankruptcy Code.

3. *Classes of PACA Claims*

Creditors entitled to assert a statutory trust on certain assets pursuant to the Perishable Agricultural Commodities Act of 1930 ("PACA"), as amended, 7 U.S.C. § 499e(c), and determined in accordance with the PACA Claims Order.

4. *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Code.

5. *Classes of Equity Interests*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders.

## ARTICLE III
## HISTORY OF THE DEBTOR & OPERATIONS

The Debtor is a North Carolina corporation, with its principal place of business located in Chadbourn, Columbus County, North Carolina. The Debtor is a fourth generation family business, started in 1935 by owners Wayne E. Bailey and Bernard Peal, when it began purchasing produce under the name W.E. Bailey & Sons, Inc. In the 1970s, the Debtor expanded into the sweet potato market. On December 28, 2009, the Debtor changed its name to Wayne Bailey, Inc. On December 31, 2009, Pride of Sampson, Inc., George Foods, Inc., and the Debtor were merged, with the Debtor as the surviving entity.

-5-

Today, the Debtor is a sweet potato grower, packer, marketer, and shipper. In addition to selling sweet potatoes, the Debtor's facility also processes and sells sweet potatoes.

Historically, the Debtor's operations have been concentrated in three divisions or categories. The first division was the farming division. Prior to the 2013 crop year, the Debtor grew some of its own sweet potatoes under the Debtor's name on real estate it owned or leased from other parties, with the remainder of the sweet potatoes purchased from contract growers. The Debtor also grew other crops such as cotton, soybeans, and other produce for crop rotation purposes. Beginning with the 2013 crop year, the Debtor stopped farming in its own name and instead began using contract growers to grow all of its sweet potatoes for purchase. The Debtor typically provided the plants to the grower as well as providing funds for harvesting costs. The Debtor would then purchase the sweet potatoes from these growers, and pack these potatoes for sale under the Debtor's brands.

The second division of the Debtor's operations was its packing division, where the sweet potatoes purchased from the contract growers or farmed by the Debtor would be processed and packed into boxes for sale to customers.  Several years ago, the Debtor invested in new technology in the form of an optical scanner, which is located at its Haworth facility, along with the Debtor's main offices.  The Debtor had hoped to improve packing efficiency by using this optical scanner to pack its sweet potatoes and reduce labor costs.  Instead, the Debtor determined that the optical scanner was not operating in an efficient manner. In January 2018, the Debtor moved the bulk of its packing operations to the Orange Warehouse, and began using the older packing line in that warehouse to pack its sweet potatoes. That change has resulted in increased efficiency in packing for the Debtor as well as a reduction in overall costs.  The Debtor now uses the Haworth facility only to pack specialty items, such as steamer bags, mesh bags, and other items that are sold to the retail industry.   The Debtor also has cold storage available at one of its facilities known as the Orange Warehouse. The Debtor also uses property owned by a related entity, WLT, in its packing operation, including a facility known as the Watec Warehouse.

The third division is the Debtor's sales operation, referred to by the Debtor as the "Sales Company." Through this division, the Debtor sells its own sweet potatoes directly to third parties, whether in boxes, or after being processed into more specialty items for the retail food industry. The sales company also brokers the sale of sweet potatoes on behalf of third parties. The Sales Company has contracts with retailers and third parties, where it contracts to sell to these entities for agreed upon prices, typically in yearly contracts. Within the assets of the Sales Company division are the Debtor's intangible assets, such as its trademarks, brands, goodwill, and customer lists.

The Debtor's operations are integrated through a number of entities that all operate in conjunction with the Debtor's corporate structure. In addition to the land and equipment owned by the Debtor, the Debtor also rents land and equipment used in its operations from WLT, Wooten Business Equipment Leasing, LLC, and Wooten.  WLT and Wooten Business Equipment Leasing, LLC are entities owned by Wooten. Upon information and belief, the obligations of the Debtor, WLT, and Wooten to CFG Financial Services, LLC ("CFG"), Cape Fear Farm Credit, ACA ("CFFC"), and Millstream Farms, LLC are cross collateralized, with

-6-

varying lien priorities as further described herein.

The Debtor's financial problems were caused by a series of poor farming year in 2012, after coming off the Debtor's best years in 2010 and 2011. After completion of the 2012 crop year, the Debtor's crop loan was not renewed by its senior secured lender.  As a result, the Debtor scaled back its farming operations that were taking place in its corporate name, and instead began to purchase sweet potatoes from contract growers, including two entities owned by Mr. Wooten's sons. The Debtor also invested in new technology, such as the optical scanner that did not work as anticipated, driving up operating costs.  The Debtor also went through a series of changes in its financing, moving from traditional lenders to more high risk and high interest financing in order to fund its operations.   Ultimately, the Debtor was not able to generate sufficient income to pay all of its contract growers and operating expenses, which has resulted in a sizeable amount of PACA claims asserted against the Debtor. The Debtor learned that its present lender, CFG was in the process of exercising its rights to seize control of the Debtor's bank accounts, and leading the Debtor to file this chapter 11 case.

## ARTICLE IV
## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

The Debtor filed its chapter 11 case on January 21, 2018, and currently operates as a debtor-in-possession. Upon filing the case, the Debtor filed several first day motions, seeking the interim use of cash collateral, seeking to pay certain outstanding checks and maintain its existing bank accounts, and seeking to pay certain pre-petition wages. Orders were entered on these motions. The Debtor also filed an application seeking to employ its attorney. The Debtor also filed several applications, seeking to employ George Wooten, Jr. as President of the Debtor, Adam Wooten as Secretary-Treasurer and Warehouse Operations Manager, George Wooten, III as Vice-President and Farm Manager, Rick Martin as Chief Financial Officer, and Alice Wooten.

On February 2, 2018, numerous creditors jointly filed a motion seeking the appointment of a chapter 11 trustee. During a hearing on this motion, the parties and the Debtor agreed to the appointment of a Chief Restructuring Officer ("CRO"). Pursuant to an Order dated February 20, 2018, Robert Sterling Cook was appointed as the CRO of the Debtor, with full authority to act on behalf of the Debtor.

On February 9, 2018, the Debtor filed a motion, seeking to establish procedures for the determination of PACA claims against the Debtor, including a deadline for PACA claims to be filed and a deadline for parties in interest to object to these claims. An Order was entered on March 5, 2018, establishing a deadline for claimants asserting claims under PACA to be filed by April 16, 2018, with objections to such claims to be filed by June 6, 2018. The Debtor has employed Gregory B. Crampton as Special Counsel to the Debtor to represent the Debtor in liquidating these claims. The list of PACA Claims filed with the Court is included on Exhibit A, along with a notation as to the status of objections filed to these Claims.  The Debtor filed a motion on May 22, 2018, seeking to make an interim distribution to PACA Claimants in the amount of $1,500,000.00. The motion proposes to hold in escrow any distribution which would be paid to a PACA Claimant if an objection has been filed to their PACA Claim. The Court held

a status conference on June 26, 2018, to determine which PACA claims, if any, required a period of time for discovery to be conducted. The Court established a sixty day period for discovery to be conducted related to the objections filed to the claims of Castellini Company, SP Funding, LLC, Southern Roots, and Tull Hills Farms. The Debtor expects hearings to be scheduled on the remaining claims objections (assuming such claims are not otherwise disallowed by the failure to respond to the objection to claim) prior to the confirmation hearing.

On March 13, 2018, the Court appointed the Official Unsecured Creditor's Committee of Wayne Bailey, Inc. (the "UCC"), and on May 24, 2018, the Court entered an Order employing John C. Bircher, III and White & Allen, P.A. as attorney for the Committee.

The Debtor has also filed several applications, seeking to employ various professionals to assist in the sale of its assets, and filed motions seeking to reject certain leases that are no longer necessary for the Debtor's ongoing operations.

The Debtor, under Mr. Cook's direction, has continued its operations, including the packing of existing inventory, purchasing new sweet potatoes for sale, and continuing to sell and broker sweet potatoes through the Sales Company. The Debtor has also continued to undertake efforts to reduce its expenses, including by eliminating leases of equipment that are no longer necessary for the operations, cutting staff, and seeking to reduce other operating expenses.

On May 1, 2018, the Debtor filed a motion for a private sale, seeking to sell its remaining farm equipment and vehicles to Southern Roots, for a purchase price of $500,000.00.  An Order was entered on June 14, 2018, approving the sale to Southern Roots.

## ARTICLE V
## SUMMARY OF THE ASSETS AND LIABILITIES

Attached as Exhibit A is a list of the Debtor's liabilities, based on claims filed as of the date of the filing of this Disclosure Statement, or if no claim has been filed, as scheduled by the Debtor.  The deadline for non-governmental creditors to file proofs of claim was May 28, 2018. Because the PACA Claims have not been determined by Final Order, the Debtor has listed all PACA claims that have been filed in Class 12, without regard to whether the Debtor believes the PACA claim is valid or not. The Debtor has indicated in certain cases those claims filed as PACA claims that are also duplicates of other claims filed in the case. The Debtor has also listed those claims to which objections have been filed.

The Debtor's assets consist of real and personal property. The Debtor's real property assets consist of its packing facility, known as the Haworth Facility, buildings used for storage, farmland, and other real estate. The majority of this real estate is encumbered by liens in favor of CFFC, to secure two loans, and Millstream Farming, Inc., Millstream Farms, LLC, Henry and Laurie Chancy, and Seven Mile, LLC (collectively "Millstream"), to secure numerous loans and leases. Attached as Exhibit C is a chart showing all of the real estate owned by the Debtor, a description of the real estate, the liens recorded against this real estate and a description of the obligations secured by this real estate, and the tax value of this real estate. The loans of CFFC

and Millstream appear to be cross-collateralized. These liens also encumber real property owned by WLT and Wooten for the same obligations as those owed by the Debtor.

The Debtor also owns personal property used in its operations. Its equipment is primarily comprised of farming equipment and equipment used in the packing operation. With the exception of certain purchase money liens in favor of CNH and Diversified Financial, the equipment is encumbered by a lien on specific equipment in favor of CFFC, and blanket liens in favor of Millstream, and CFG.

The Debtor also owns equipment that is presently leased to Trinity Frozen Foods, LLC. This equipment is subject to a lien in favor of Millstream and CFG, as CFFC released its lien on the majority of this equipment.

The Debtor's inventory consists primarily of sweet potatoes. The Debtor also maintains an inventory of cardboard and parts. Exhibit D and Exhibit I show the Debtor's projected inventory levels for the remainder of the case, as well as the actual inventory levels from the Petition Date through the weekly report for the last week prior to filing the Plan. These assets are subject to the claims of the PACA Claims, which are superior to the claims of any other party. CFG and Millstream have liens on these categories of assets as well.

The Debtor's other assets can be briefly described as follows:

Vehicles - The Debtor owns a number of vehicles, as itemized in its Schedules. A list of the unencumbered vehicles was attached to the Schedules as Exhibit A.

Life Insurance - The Debtor maintains a keyman life insurance policy on the life of George Wooten, Jr. This policy presently has a cash surrender value of approximately $325,000.00. This policy has been assigned to CFG as collateral for its loan. The Debtor also has an insurance policy with no cash value on the life of Mr. Wooten that has been assigned to CFFC and CFG.

Trademarks - The Debtor maintains several trademarks registered with the United States Trademark Office, as further itemized in its Schedules. The value of these trademarks is unknown. These trademarks are encumbered by liens in favor of CFFC, Millstream, and CFG. These trademarks are one of the primary assets of the Sales Company as they reflect the Debtor's brands, which have gained recognition in the industry.

Interests in Corporations/Cooperatives - The Debtor owns stock, warrants, or memberships in several limited liability companies and cooperatives. The Debtor valued these at its cost on the Schedules; however, the value of these assets is unknown. Other than Trinity Frozen Foods, LLC, the Debtor does not believe these entities are operating and the Debtor has not been receiving income from these entities. The Debtor believes these entities have no value.

Trinity Frozen Foods Note Receivable - Trinity Frozen Foods, LLC executed a promissory note in favor of the Debtor in the principal amount of $2,700,000.00, for the

purchase of sweet potatoes from the Debtor. Trinity Frozen Foods, LLC is presently making interest only payments on this note in the amount of $33,750.00 per month. In late 2018, this payment will increase to a principal and interest payment. This note is encumbered by a lien in favor of CFG.

## ARTICLE VI
## MEDIATED SETTLEMENT AGREEMENT

On May 31, 2018, the Court entered an Order Referring Case to Mediation, referring the Adversary Proceeding No. 18-00037-5-SWH along with all contested issues surrounding the Debtor's Plan to mediation. On June 5 and 6, 2018, the Mediation Participants participated in a mediation of these issues. At the conclusion of the mediation, the Mediation Participants signed a Mediated Settlement Agreement. The Mediated Settlement Agreement resolved issues between the parties as to the treatment of claims in the Plan, sales of assets, resolution of the adversary proceeding, and the administration of the estate post-Effective Date.

By way of summary, the Mediation Participants agreed to the following in the Mediated Settlement Agreement:

1.  <u>CFG's Claim</u>.  The Mediated Settlement Agreement provides for a consensual Plan treatment for CFG's claim, to be paid by (i) the surrender of certain assets for a credit against the claim; (ii) the sale of certain assets with any proceeds paid to CFG as a lienholder applied against its claim; (iii) the application of cash on hand and accounts receivables when collected applied against the claim after payment of PACA Claims; and (v) a promissory note in the amount of $1,015,000.00 plus any diminution in the collateral position, secured by a lien on certain assets to repay the balance of the claim over time. The Mediated Settlement Agreement also provides that the Debtor will dismiss all claims against CFG and its lender-participants upon the Effective Date if CFG votes in favor of the Plan, including a dismissal of the claims in the Adversary Proceeding, as well as grant CFG a full release of all known and unknown claims. The Mediation Participants have also agreed not to contest the CFG claim, object to the claim, or seek to otherwise recharacterize or subordinate the claim.  CFG has agreed to certain carve-outs for the payment of professional fees from its cash collateral. CFG's requirement to support the Plan is conditioned upon the Debtor's collateral position on August 1, 2018 being within 10% of that projected in the cash collateral budget to be submitted to the Court for that same date. If CFG does not support the Plan, the provisions regarding the grant of releases, agreements not to object to the claim, and dismissal of the adversary proceeding will no longer be binding on the Debtor or the Mediation Participants.

2.  <u>Millstream Claims</u>. The Mediated Settlement Agreement provides for a consensual Plan treatment for Millstream's claims, including its secured claims and a lease, through the sale of assets and payments over time, as spelled out in the Plan. The Mediated Settlement Agreement specifies which properties will be sold to satisfy this claim.   The Mediated Settlement Agreement also provides for a release of claims between the parties. Because real estate will likely be sold after the Effective Date of the Plan that will reduce the balance of this claim, the Debtor and Millstream have agreed upon an amount of Millstream's

-10-

claim for purpose of monthly payments under the Plan in the amount of $2,600,000.00, subject to a "true up" based on the actual results of the sale after they have closed. The Debtor and Millstream have also agreed upon the manner in which Millstream's remaining collateral will be valued for purposes of determining Millstream's final allowed secured claim amount.

3.    <u>SP Funding, LLC</u>. The Mediated Settlement Agreement provides for a release of all claims in the Adversary Proceeding against SP Funding, except for Chapter 5 avoidance actions. SP Funding has agreed to forbear and ultimately release certain rights to pursue claims to clawback assets that may be PACA Trust assets while the Mediated Settlement Agreement remains in effect.

4.    <u>Sale of Assets</u>. The Mediated Settlement Agreement establishes a list of Debtor and non-Debtor properties that will be sold to pay creditors' claims, as well as a deadline for certain sales to close, including the sales of real and personal property to Southern Roots. The sales of certain non-Debtor real estate will reduce certain obligations of the Debtor that are provided for in the Plan, and the Mediation Participants have agreed on a price for the sale of real estate to Southern Roots and a release of liens to facilitate the sale of non-Debtor real estate.

5.    <u>Plan Trustee</u>. The Mediated Settlement Agreement provides that a Plan Trustee will carry out the majority of the post-confirmation duties of the Debtor or the Estate which would otherwise be performed by the Reorganized Debtor. Mr. Bircher will serve as the Plan Trustee and be responsible for pursuing avoidance actions, objecting to claims, collecting accounts receivable, and making certain distributions under the Plan.

6.    <u>Conditions</u>. The Mediated Settlement Agreement provides certain deadlines for the Debtor or WBPC to obtain exit financing, use of the Watec Warehouse, and secure a PACA license.

7.    <u>Plan Support</u>. The Mediation Parties have agreed that, subject to certain conditions described in the Mediated Settlement Agreement, they will support and vote in favor of a Plan consistent with the terms of the Mediated Settlement Agreement. The Committee has also agreed to recommend to unsecured creditors that they support the Plan.

A copy of the Mediated Settlement Agreement is attached hereto as Exhibit L.

**<u>ARTICLE VII</u>**
**SUMMARY OF THE PLAN**

The Debtor's Plan incorporates the terms of the Mediated Settlement Agreement and proposes that the Debtor will liquidate certain real and personal property that is not needed in the future operations. The Debtor's future operations will be conducted under the name of Wayne E. Bailey Produce Co., LLC ("WBPC"), a Delaware limited liability company.

A.    <u>Sales of Real Estate Proposed by the Plan (Exhibit E)</u>

The Debtor's Plan proposes the sale of real estate through multiple sales. The Debtor has attached Exhibit E to the Disclosure Statement, which describes the Debtor's current manner of sale of each tract of land to be sold by the Debtor. Presently, the Debtor believes that it will engage in multiple sales of the real estate:

(1)       The Debtor has obtained an offer from Southern Roots to purchase the property known as the Orange Building, Red & White Building, the Harrison Farm, the Grain Market, the Blue Building, and the Labor Camp, along with non-Debtor owned real estate. The purchase offer also includes the sorting line which is located in the Orange Building.  The purchase price for all of these assets, including the non-Debtor real estate, is $1,175,000.00.    The Debtor will file a motion seeking approval of this sale.  Pursuant the Mediated Settlement Agreement, if Southern Roots does not consummate the purchase of these assets by September 15, 2018, the Debtor will sell these assets by public sale.

(2)       The Debtor intends to sell by auction the four properties listed on Exhibit E. The Debtor has obtained approval for Ironhorse Auction to conduct a public online auction of these properties.

(3)       The Debtor and certain non-Debtor entities are currently negotiate a contract for the purchase of the remaining two tracts of land owned by the Debtor, the Worley property (both the encumbered and unencumbered parcels), and the Harry Reed Property. These properties would be sold via a sale that is expected to close in December 2018. The Debtor will file a motion seeking approval for the terms of the sale once a final contract is agreed upon.

(4)       The Debtor's Haworth facility is comprised of three tracts of land. The Debtor will convey to WBPC the tracts comprised of parcel numbers 25079 and 80843. The Debtor has determined that a portion of parcel number 86421 is no longer needed for the operations, and the Debtor will sell a portion of this parcel, with the remaining portion of this parcel being retained. The Debtor believes this parcel has some potential commercial usage, as it is located at the intersection of two North Carolina highways. As a result, the Debtor will seek approval to employ a broker to sell of this property, according to terms approved by the Court.

All of the proceeds from the sale of real estate shall be distributed to lienholders in accordance with the priorities of liens. The Debtor will file a motion after the public sale is held, setting forth the proposed distribution of the sales proceeds.

(5)       The Debtor will convey the Callahan House to CFG, as set forth in the Plan.

B.       <u>Sale of Personal Property (Exhibit F)</u>

The Debtor has obtained approval to sell the assets listed on Exhibit F plus two Valley Irrigation Pivots to Southern Roots for a purchase price of $500,000.00.  In the event Southern Roots does not close on this sale by September 15, 2018, the Debtor will sell these assets by public sale. The Net Proceeds of Sale shall be distributed to lienholders in accordance with the terms of the Order entered on June 14, 2018, approving the sale to Southern Roots.

-12-

C.    Reorganized Operations (Exhibits G and H)

Currently, the Debtor estimates that it will complete the packout of the majority of its existing inventory by the date of confirmation, estimated to be September 6, 2018, and the Debtor will continue operating in its existing format through the completion of that inventory.

The CRO has obtained a Commitment Letter for Exit Financing in the amount of $11,231,128 in the name of WBPC and Southern Roots, which will be co-borrowers under this financing arrangement, with a total of $10 million to be used by WPBC. At the Effective Date of the Debtor's Plan, the Debtor will cease its day to day operations. At that time, the Debtor will proceed with the liquidation of its remaining assets, if any remain unsold, and the collection of all remaining accounts receivable under the supervision of the Plan Trustee. WBPC will commence operations, and take responsibility for all ongoing operational costs, including employee labor. WBPC will purchase any remaining inventory of the Debtor for the greater of (i) book value; or (ii) market value.

The assets listed on Exhibit G shall be conveyed to WBPC subject to all existing liens and Allowed Claims as determined by the Plan. WBPC shall assume responsibility for the payment of these obligations.

The assets listed on Exhibit G shall be conveyed to WBPC for a total purchase price of $1,015,000.00. WBPC shall execute a promissory note in favor of CFG, as further described in the Plan, and CFG shall have a first lien on the same assets once conveyed to WBPC as it held in the Debtor. WBPC shall make monthly payments to CFG until the CFG Secured Claim is paid, and thereafter if any balance remains owed on the note, to the Plan Trustee for distribution to creditors. WBPC will operate in the Haworth Facility and the Watec Warehouse, owned by WLT), which WBPC will lease from WLT. WBPC will not own or lease any other real estate. WBPC will engage primarily in the sales and storage of sweet potatoes, and use Southern Roots to pack the majority of its sweet potatoes for an agreed upon fee. WBPC may engage in packing in the Haworth Facility as to specialty items used primarily in the food service industry, but does not expect to engage in packing to the same extent as previously performed by the Debtor.

Following the Effective Date of the Plan, the Plan Trustee will pursue Causes of Action and distribute any proceeds collected in accordance with the priorities of the Code.

D.    Plan Trustee

The Debtor's Plan provides that on the Effective Date, John C. Bircher, III shall be named as the Plan Trustee. The Plan Trustee shall assume the rights and obligations of the Debtor from and after the Effective Date on behalf of the Estate. The duties of the Plan Trustee include:

- Reviewing, analyzing, and pursuing or hiring counsel to pursue Causes of Action;

- Objecting to the claims of creditors, except for claims released under the Plan;

- Collecting accounts receivable that remain owing to the Debtor as of the Effective Date and distributing the funds collected according to the terms of the Plan; and

- Acting as disbursing agent for certain payments to creditors under the Plan, including unsecured creditors.

## <u>ARTICLE VIII</u>
## ADDITIONAL INFORMATION

### A.    <u>Post-Confirmation, Pending, or Threatened Litigation</u>

On May 18, 2018, the Debtor filed an adversary proceeding against CFG and its individual lender participants plus SP Funding, LLC, Adversary Proceeding Case No. 18-00037-5-SWH. This Adversary Proceeding was resolved as part of the Mediated Settlement Agreement, except as to any Chapter 5 avoidance actions against SP Funding, LLC.

On June 26, 2018, SP Funding, LLC filed an adversary proceeding against the Debtor and George G. Wooten, Jr., captioned SP Funding, LLC v. George G. Wooten, Jr. and Wayne Bailey, Inc., Adversary Proceeding Case No. 18-_____.  This adversary proceeding alleges causes of action against Mr. Wooten based upon alleged PACA Trust obligations and against the Debtor for the non-dischargability of a portion of its debt. The deadline for the Debtor to respond to this adversary proceeding has not yet run.

There are presently no other adversary proceedings pending before the Bankruptcy Court.

The Plan Trustee as applicable may continue, institute, or abandon such legal actions as the Plan Trustee deems necessary and which have not been expressly waived.  All Causes of Action shall be brought in the Bankruptcy Court and are to be governed by Rule 7001 et seq. of the Federal Rules of Bankruptcy Procedure.  Any compromise or other settlement of a controversy shall be approved by the Court.  Attached as Exhibit E to the Statement of Financial Affairs was a list of payments made by the Debtor in the ninety days prior to filing. The Debtor will continue to investigate potential Causes of Action prior to the Effective Date in consultation with the Committee and will institute those causes of action which the Debtor determines should be filed prior to the Effective Date. Thereafter, the Plan Trustee will assume responsibility for pursuing this responsibility. The Causes of Action are unencumbered assets of the Debtor, and any proceeds recovered from such causes of action shall be distributed in accordance with the terms of the Plan.

### B.    <u>Objections to Claims</u>

-14-

Allowance of a claim or interest for voting purposes does not necessarily mean that all or a portion of a claim will be allowed or disallowed for distribution purposes. The Debtor, the Plan Trustee or any other party in interest may file an objection to a claim that will then be allowed or disallowed by the Court after notice and an opportunity to be heard; provided however, the Plan provides that the secured claim filed by CFG shall be conclusively deemed an allowed secured claim and may not be equitably subordinated or recharacterized.

A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.nceb.uscourts.gov or any bankruptcy clerk's office. Alternatively, the claim may be filed electronically. If your Claim is *scheduled by the Debtor*, it will be allowed in the amount scheduled unless (1) the Claim is designated as Disputed, Contingent, or Unliquidated, (2) you file a proof of claim in a different amount, or (3) you receive another notice. If your Claim is *not scheduled by the Debtor* or *if designated as Disputed, Contingent, or Unliquidated*, you must file a proof of claim or you might not be paid on your Claim and you might be unable to vote on the Plan. However, a proof of claim may be filed even if your Claim is scheduled by the Debtor. You may review the Schedules filed by the Debtor in the Bankruptcy Case at the Office of the Clerk of Court for the Eastern District of North Carolina, or online at www.pacer.gov.

The deadline for filing proofs of claim was May 29, 2018 for non-governmental creditors, and July 20, 2018 for governmental creditors.

### C.    PACA Claims

Pursuant to the Order dated March 5, 2018, claimants asserting claims against the Debtor under PACA must file a PACA proof of claim (not a proof of claim as described above), on the form attached to the Order and containing the documentation described therein. The deadline for creditors asserting a PACA Claim was April 16, 2018. Pursuant to the terms of the Order, claimants failing to file a PACA claim will be treated as General Unsecured Claims. For purposes of Exhibit A, the Debtor has classified all PACA claims of which it is aware in the PACA Claims Class (Class 12 of the Plan). The Debtor has hired Special Counsel to review and object to PACA claims on its behalf.

### D.    Financial Information.

The following information is available to Creditors and other parties in interest either as a matter of public record or by request: monthly reports, Schedules, Statement of Financial Affairs, and weekly reports of operations as described in the cash collateral orders.

### E.    Exhibits to this Disclosure Statement.

The Debtor has attached a number of Exhibits to this Disclosure Statement, some of which have been previously described above. To the extent not described above, these Exhibits, and any assumptions made in preparing these Exhibits are as follows:

-15-

1.      Exhibit A - <u>Liabilities</u>. This Exhibit contains a list of the Debtor's liabilities, as further described above. The liabilities listed on Exhibit A are based on claims filed as of the date of the filing of this Disclosure Statement.

2.      Exhibit B - <u>Liquidation Analysis</u>.  This Exhibit, entitled "Liquidation Analysis," calculates the potential recovery to Unsecured Creditors in the event the Debtor and its assets were liquidated under chapter 7 of the Bankruptcy Code.  As such, it reflects the amount that would be available to Unsecured Creditors if all of the Debtor's assets were liquidated and the proceeds paid in accordance with the priorities of the Bankruptcy Code in a chapter 7 case.  For purposes of this liquidation analysis, the Debtor has only included assets which will be conveyed to WBPC, as the Debtor's Plan already contemplates the liquidation of all other assets and the disbursements of proceeds to creditors according to the priorities of the Code. The Liquidation Analysis was prepared by the Debtor, and its legal counsel, and represents its estimate and projection of the proceeds that would be realized if its assets and property were liquidated in accordance with chapter 7 of the Bankruptcy Code.  For purposes of the Liquidation Analyses, the Debtor has utilized the value on its Schedules for the value for each parcel of real property. The Debtor has not applied any discounts to this value that might occur as a result of a sale by a chapter 7 trustee, or any other discount to reflect a "quick" sale or "liquidation" value.  The valuation of the cash and cash equivalents, on the Liquidation Analysis, is based upon the balances shown in the Debtor-in-Possession Bank Accounts as of the date that the Plan was filed. The Debtor has utilized the fair market value of its remaining personal property as of the Petition Date, unless another date is specifically identified. For purposes of estimating the liens against the Haworth Facility, the Debtor has assumed that CFFC and Millstream will be partially paid down by equipment and real estate sales.

3.      Exhibit C - <u>Real Estate List</u>.  This exhibit contains a list of all real estate owned by the Debtor as well as the priorities of liens against such real estate.

4.      Exhibit D - <u>Cash Collateral Budget</u>. This exhibit is the Debtor's Cash Collateral budget from June 20th through confirmation. This budget projects the Debtor's income and expenses during this time period, as well as the Debtor's projected cash balance, accounts receivable balance, and inventory value through confirmation.

5.      Exhibit E - <u>Real Estate to Be Sold</u>.  This exhibit contains the real estate to be sold by the Debtor, and the Debtor's current manner of selling such real estate. As described above, the Debtor has already obtained approval from the Court for Ironhorse to conduct the sale of four properties by auction.

6.      Exhibit F - <u>List of Personal Property to be Sold to Southern Roots</u>. This exhibit contains the personal property to be sold by the Debtor to Southern Roots, which was previously approved by the Court on June 14, 2018.

7.      Exhibit G - <u>List of Property to be Conveyed to WBPC.</u> This exhibit contains the list of assets that will be conveyed to WBPC pursuant to the terms of the Plan along with two Valley Irrigation Pivots. Those assets with liens on them will be conveyed subject to all existing

liens. Following the conveyance of those assets, WBPC will assume responsibility for payment of any debt service payments associated with such assets.

8.      Exhibit H - <u>Historic Financial Statements</u>. Exhibit H contains the Debtor's historic financial statements from 2015 through 2017 (preliminary results).

9.      Exhibit I - <u>Actual Results in Chapter 11</u> - This exhibit contains the Debtor's actual income and expenses during the period of the chapter 11 case.

10.     Exhibit J - <u>Projections of WBPC</u>. Exhibit J contains the projections prepared for the operations of WBPC, subject to its new financing arrangement.

11.     Exhibit K - <u>Balance Sheet for WBPC</u>.  This exhibit contains a projected rolling balance sheet for WBPC under its new operations, to reflect its ability to borrow against its new credit facility.

12.     Exhibit L - <u>Mediated Settlement Agreement</u>. Attached as Exhibit L is a copy of the Mediated Settlement Agreement.

**ARTICLE IX**
**MEANS OF IMPLEMENTATION AND EXECUTION OF PLAN**

A.      <u>Continuance of Operations</u>. The Debtor shall continue its existing operations until the Effective Date of the Plan. At that time, the Debtor shall cease all ongoing operations and convey the assets to WBPC as described herein.

B.      <u>Disposition of Assets</u>.  The Debtor shall sell all of its remaining real and personal property assets, except (i) assets to be conveyed to CFG Financial Services, LLC and (ii) assets to be transferred to WBPC. To the extent a sale has not been approved by separate Order prior to the Effective Date, the Debtor will file a motion(s) as to each sale to be conducted.  The Debtor has previously obtained approval to sell certain equipment and vehicles to Southern Roots, including two Valley Irrigation Pivots, in an Order entered on June 14, 2018 [D.E. 400], and will sell (with Wooten and WLT) the real estate known as the Orange Warehouse (PIN 25798), Blue (PIN 25797), Green (PIN 23536), Red & White (PIN 25085), Biggs (PIN 94135, 21448), Evergreen (PIN 20852), Harrison Farm (PIN 22724), Reuben (PIN 21672), Grain Market (PIN 25796), Oil Lot (PIN 23442), and the Labor Camp (PIN 77343), together with the packing equipment located in the Orange Building, to Southern Roots for an aggregate purchase price of $1,175,000. The $1,175,000 sales price includes the sorting line.  However, such sale price does not include the refrigeration (which is subject to a lien in favor of PNC Bank) or the sizer (which is subject to a lease in favor of Alliance Financial Group).  There will be additional consideration for such refrigerator and sizer, and neither CFG nor Millstream will assert any lien on the refrigerator or sizer, or the proceeds thereof, as part of any sale to Southern Roots.  The Net Proceeds of Sale from these sales shall be distributed in accordance with the terms of the Orders approving such sales, consistent with the terms of this Plan.  In the event Southern Roots does not close on the purchase of these personal property and real estate assets by September 15,

-17-

2018, the Debtor shall file a motion within fifteen days thereafter to sell such assets by public sale. Any remaining equipment that is not sold to Southern Roots or transferred to WBPC shall be sold by public auction within 45 days of the Effective Date. The Net Proceeds of Sale shall be distributed to lienholders in accordance with the priorities of liens and as further set forth below.

C.    Conveyance of Assets to CFG.  On the Effective Date of the Plan, the Debtor will convey the assets listed herein to CFG, in the following manner:

    a.    The Trinity Note shall be assigned to CFG.

    b.    The Callahan House shall be conveyed to CFG or its designee.

    c.    The Transamerica whole life insurance policy #3615 and the Prudential term life insurance policy #7237 shall be assigned to CFG.

    d.    CFG shall receive the promissory note executed by WBPC, together with a security agreement which shall provide a first lien upon the general intangibles and other assets transferred to WBPC upon which CFG previously had a lien (excluding any inventory purchased by WBPC on the Effective Date).

    e.    On the Effective Date, all funds on deposit in the Debtor's bank accounts, including funds to be paid by WBPC to purchase any remaining inventory (described below) and all accounts receivable (upon collection) shall be paid to CFG, after payment or provision for Allowed PACA Claims and the carve-out for approved professional fees.

D.    Conveyance of Assets to WBPC.  On the Effective Date of the Plan, the Debtor will convey the assets listed herein to WBPC, in the following manner:

    a.    The real estate and equipment listed on Exhibit G shall be conveyed to WBPC on the Effective Date of the Plan, subject to the liens on such assets listed therein. WBPC shall assume responsibility for making all Plan payments to such creditors with liens, in accordance with the treatment for each creditor in the Plan.

    b.    The assets listed on Exhibit G shall be sold to WBPC, for a purchase price of $1,015,000.00, subject to the lien in favor of CFG described in the CFG Plan treatment.

    c.    On the Effective Date, WBPC will purchase any remaining inventory of the Debtor at the greater of (i) book value, or (ii) market value. The purchase of the inventory by WBPC shall be free and clear of all liens, claims, and encumbrances.

E.    Distribution of Sales Proceeds. The Plan Trustee shall distribute the Net Proceeds of Sale as follows:

    a.    Distribution of Real Estate Proceeds.  The Net Proceeds of Sale shall be

-18-

paid to lienholders in accordance with the priority of liens by the attorney conducing the closing of such sale, with any unencumbered funds paid to the Plan Trustee for distribution in accordance with the terms of the Plan. In the event real estate is sold without a specific purchase price allocated between parcels of real estate, or in the event multiple parcels of real estate are sold as a single farm and the lien priorities are different amongst the various parcels of real estate, the purchase price shall be allocated pro rata based upon a per acre price; provided however, in the event the lienholders believe that a per acre price is not appropriate for any farm due to differences in such parcels, the Debtor shall be authorized to close the sale, and the Court shall determination the appropriate allocation of the purchase price after notice and hearing.

        b.    <u>Sale of Personal Property</u>. The Net Proceeds of Sale shall be paid to lienholders in accordance with the priority of liens. In the event personal property is sold without a specific purchase price allocated to a specific asset and there are more than one party with a lien upon the assets sold within the pool of assets, the purchase price shall be allocated based on appraisals of the property sold if appraisals of such property exist; (ii) by agreement of the parties; or (iii) as determined by the Court after notice and hearing.

        c.    <u>Unencumbered Assets</u>. All funds from unencumbered assets shall be paid to the Plan Trustee, who shall then distribute such proceeds in accordance with the priorities of the Code, subject to any reservations necessary to pay outstanding or projected administrative claims.

        d.    <u>Motions for Distribution</u>.  In the event that there is a dispute as to the priority of liens or the amount owed to any Secured Creditor that cannot be resolved by the parties, the Plan Trustee shall promptly file a motion with its proposed distribution of the proceeds with the Court.

        e.    <u>Reservation of Rights Pending Resolution of PACA Claims</u>.  Until such time as all Allowed PACA Claims have been paid in full, any distributions of Net Proceeds of Sale to Secured Creditors shall be subject to a full reservation of the rights and repayment by such Secured Creditor in the event it is later determined that such Net Proceeds of Sale or asset sold constituted an asset of the PACA Trust.

        F.    <u>Collection of Accounts Receivable</u>.  Collection of the outstanding accounts receivable of the Debtor as of the Effective Date shall be overseen by the Plan Trustee and disbursed first to allowed PACA Claims that are not subordinated, then to the costs of collecting the accounts receivable, then to CFG until the CFG Secured Claim is paid in full, and then as otherwise provided in the Plan. The Debtor shall provide to the Plan Trustee a list of the current outstanding accounts receivable as of the Effective Date, and the Plan Trustee shall pursue or compromise (subject to approval by the Court) any outstanding accounts receivable not timely paid.  The Plan Trustee shall act as the disbursing agent for these funds collected, subject to the distribution of accounts receivable set forth above.

G.    <u>Distributions From Recoveries of Causes of Action.</u> The Plan Trustee  shall distribute the proceeds recovered from any Causes of Action first to pay any costs of collection or attorney's fees associated with the Causes of Action, next to CFG to satisfy any outstanding balance on its lien on the Causes of Action, next to outstanding administrative claimants, subject to any reserves deemed necessary in the discretion of the Plan Trustee to pay any pending or expected post-confirmation fee applications of professionals; next to any outstanding priority claims, if any; and last to Allowed General Unsecured Claims, such funds to be distributed pro rata.

H.    <u>Distributions to Unsecured Creditors</u>. The Plan Trustee shall not make any distributions to holders of General Unsecured Claims until (i) all Allowed PACA Claims have been satisfied in full; (ii) the deadline for filing proofs of claim has expired; (iii) the deadline for parties in interest to file objections to claims has expired; (iv) all objections to claim have been resolved by Final Order; and (v) the deadline for filing deficiency claims has expired. The Plan Trustee may file a motion seeking to establish the distribution percentage to be received by each holder of a General Unsecured Claim, which shall govern all future distributions to holders of General Unsecured Claims.

I.    <u>Returned Payments/Unclaimed Payments</u>.  Unless otherwise notified in writing, the Plan Trustee shall make distributions to creditors at (i) the address listed in such creditor's Proof of Claim filed with the Court; or (ii) at the address listed on the Debtor's Schedules for such creditor.  In the event any payment made to a creditor remains unclaimed or any check remains uncashed for a period of ninety (90) days or any payment is returned as not deliverable due to an insufficient address, the Plan Trustee shall be entitled to void such check or stop payment on such check.  In the event of any returned payment or uncashed payment, the Plan Trustee shall make a good faith attempt to locate the recipient, but if such attempt fails, then the Plan Trustee shall not attempt to make any further distributions toward such claimant, and such claimant shall not be entitled to any future distributions under the Plan.  Instead, such funds shall be distributed to the remaining creditors according to the manner set forth for distributions under this Plan.

J.    <u>Costs of Distribution</u>.  The Plan Trustee shall be entitled to withhold from any distribution the ordinary and reasonable costs of making such distribution.

K.    <u>Duties of the Plan Trustee</u>.  From and after the Effective Date, the Plan Trustee shall serve under this Plan and shall discharge all of the rights, powers, and duties set forth in this Plan. The Plan Trustee, acting on behalf of the Debtor, shall have the following rights, powers and duties: (i) to employ and compensate the professionals as the Plan Trustee may select to carry out its duties under this Plan; (ii) to review, investigate and (if appropriate) object to or seek equitable subordination of Claims against the Estate except for those rights to equitable subordination released by this Plan; (iii) to investigate, prosecute and/or settle (as provided in this Plan) all Causes of Action; (iv) to voluntarily engage in arbitration or mediation with respect to any Cause of Action; (v) to calculate and make all distributions to be made pursuant to this Plan that are to be made by the Plan Trustee; (vi) to seek estimation of contingent or unliquidated Claims under Section 502(c) of the Bankruptcy Code; (vii) to review, investigate and (if

-20-

appropriate) object to the claim(s) of any creditor; and (viii) to take all other actions in furtherance of the implementation of this Plan.  The Plan Trustee shall not be disqualified from hiring any professional because such professional previously represented the Debtor or any creditor of the Debtor, if in the business judgment of the Plan Trustee, such prior representation will not cause an actual conflict of interest in the representation to be undertaken.

L.      Compensation of Plan Trustee. The Plan Trustee will be paid at his normal hourly rates for his services under this Plan, unless the Plan Trustee seeks approval from the Court for a different manner of compensation for all or any portion of the duties to be performed under this Plan. The Plan Trustee shall be authorized to pay himself compensation on such reasonable schedule as the Plan Trustee deems necessary, not more often than once every thirty (30) days. The Plan Trustee may elect to serve as his own attorney at his normal hourly rates

M.      Replacement of Plan Trustee. In the event the Plan Trustee is unable to serve due to resignation, retirement, death, incompetence, or other disability, the Bankruptcy Court shall retain jurisdiction to determine a replacement Plan Trustee. In such event, the Bankruptcy Administrator shall be responsible for seeking the appointment of a replacement Plan Trustee by the Bankruptcy Court.

N.      Bond of Plan Trustee. The Plan Trustee shall serve without posting a bond.

O.      Exculpation of Plan Trustee.  Neither the Plan Trustee, nor any of his employees, attorneys, accountants, consultants, agents, or representatives, who are acting on behalf of, overseeing, or undertaking any of their duties shall have or incur any liability to any person for any act or omission in connection with or arising out of the course of his duties or the property to be distributed under this Plan, except if such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct; provided however, that nothing contained herein shall relieve the Plan Trustee from his duties and responsibilities outlined in the Plan.

P.      Distributions by the Plan Trustee. The Plan Trustee shall make distributions from proceeds held by the Plan Trustee when, in the opinion of the Plan Trustee, a distribution can be made in sufficient amount to justify said distribution, subject to the limitations in Paragraph F as to the commencement of distributions.  If there are not sufficient funds to pay Claims in full, Claims shall be paid *pro rata* based on the respective amount of the Allowed Claims. The Plan Trustee shall be allowed to rely on all Orders of the Bankruptcy Court, proofs of claim filed, and in the absence of a proof of claim, the amount scheduled by the Debtor, when making distributions to creditors. The Plan Trustee shall not be required to file motions with the Bankruptcy Court to determine the amount of any Claim, but may do so if needed.

Q.      Termination of Plan Trustee's Duties. The duties of the Plan Trustee shall terminate after (i) the Plan Trustee has completed (whether by Final Order of the Court, settlement between the parties, or some other manner of resolution) those Causes of Action which the Plan Trustee, in his sole discretion, believes should be pursued; (ii) the Plan Trustee believes no further assets, proceeds, or cause of action exist, which the Plan Trustee reasonably

-21-

believes, in his sole discretion, can be used to generate proceeds for the Unsecured Creditors; (iii) the receipt of the final payment on the promissory note executed by WBPC in favor of CFG; and (iv) the Plan Trustee has completed all duties of the Plan Trustee under this Plan.

R.     Authority of the Reorganized Debtor.  The Reorganized Debtor shall have the authority to implement any term or provision of this Plan.  To the extent that any right is granted to the Reorganized Debtor under the Plan, then the Reorganized Debtor shall have authority to carry out any and all acts necessary to fulfill the terms of the Plan.  Any authority granted to the Debtor pursuant to the Plan shall be construed as authority granted to the Reorganized Debtor.

S.     Except as otherwise modified in the treatment for each Secured Creditor set forth in Article III, all other terms and conditions of any promissory note, security agreement, deed of trust, loan agreement, or other loan document held by a Secured Creditor, including all insurance requirements and events of default (excluding cross default provisions unless expressly retained in Article III of the Plan) shall remain in force and effect as they were on the Petition Date. However, no term or event of default that would create an immediate default due to the Debtor' existing bankruptcy filing or financial condition, or are inappropriate due to the existing bankruptcy or financial situation shall be enforceable.  The provisions of any security instrument that allows a Secured Creditor to foreclose on the collateral in the event of a default shall remain in effect.  Any affirmative financial covenants in any of the loan documents relating to the debt that do not relate to the preservation, protection, repossession or foreclosure of the collateral shall not be effective post-confirmation unless expressly provided for in Article III of the Plan.

T.     Plan Default Remedies:  All payments required under the Plan shall be subject to the following default and cure provisions:

1.     The Debtor shall have thirty (30) days from written notice of default to cure any alleged payment or non-monetary default; and

2.     If the Debtor fails to cure any such Plan obligation within the thirty (30) day period, the affected creditor (i) may, without further notice or Order of the Court, exercise all collection rights under applicable state law with respect to its Allowed Claim(s), and (ii) seek further Orders of the Court in aid of consummation of the Plan.

U.     Cancellation of Liens.  In the event the treatment provided for a Secured Creditor in Article III results in such creditor being treated as wholly unsecured, such creditor shall cancel its deed of trust, judgment lien, or security instrument within thirty (30) days of the Effective Date.

V.     Except as expressly stated in the Plan, or allowed by a Final Order of the Bankruptcy Court, no interest, penalty, or late charge shall be allowed on any claim subsequent to the Petition Date, unless otherwise required by the Code.  No attorney's fees or expenses shall be paid with respect to any claim except as specified herein or as allowed by a Final Order of the Court.

W.    Post-Confirmation Sales by the Reorganized Debtor.  The Reorganized Debtor may sell, transfer, or otherwise dispose of all or some of their assets at any time after the Effective Date as provided in the Plan.

X.    Deficiency Claims.  Unless otherwise specified in the Plan treatment for a particular creditor or a prior Order of the Court, any creditor entitled to assert a deficiency claim shall have 30 days after the later of (i) the Effective Date or (ii) sale of the collateral securing such Claim, to file a Proof of Claim for any deficiency or be forever barred from asserting any deficiency claim and such obligation shall be deemed paid in full.  Such Proof of Claim shall include an itemization of the principal, interest, and other costs.  Any such deficiency claim shall be treated in the unsecured creditor class.

Y.    Claims Paid by Third Parties.  To the extent a claim holder receives payment in full or in part on account of such claim from a party that is not the Debtor, such creditor shall, within two (2) weeks thereafter inform the Debtor of such payment, and such creditor's claim shall be reduced accordingly for purposes of distribution under the Plan.

Z.    Termination of Obligations.  Notwithstanding any provision of the Plan to the contrary, all obligations of the Debtor to holders of Allowed Claims in the Classes of Claims designated under the Plan cease and desist upon the payment of the full amount due to such Class under the Plan.

AA.    All fee applications, including secured creditors' applications for allowance of post-petition fees under § 506(b) of the Code, shall be filed with the Court within 60 days after the completion of sales of all Debtor and non-Debtor property to be sold, with the right to file supplemental applications as may be permitted or required by the Court; provided however, that the Debtor retains the right to object or otherwise pursue any claims against Secured Creditors relating to the payoff and/or satisfaction of their secured claims.  Objections to claims shall be filed within 120 days of the Effective Date.

BB.    The Debtor will execute and deliver all documentation to all parties in interest who are entitled to receive the same as required by the terms of the Plan and the Bankruptcy Code.

CC.    The Debtor shall take such other action as necessary to satisfy the other terms and requirements of the Plan and the Bankruptcy Code.

DD.    Exemption from Transfer Taxes.  Pursuant to § 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including without limitation, deeds, or bills of sale or assignments of personal property executed in connection with any of the transactions contemplated under the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.  Each of the relevant state or local governmental officials or agents will forego the collection

-23-

of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment consistent with the applicable provisions of the Plan.

EE.    <u>Dissolution of Unsecured Creditors' Committee</u>. The Unsecured Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Debtor's Chapter 11 Case on the Effective Date; *provided,* that the Unsecured Creditors' Committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except, applications filed by counsel for the Committee pursuant to sections 330 and 331 of the Bankruptcy Code. The Reorganized Debtor shall not be responsible for paying fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

FF.    <u>No Post-petition Interest on Claims</u>. Unless otherwise specifically provided for in an Order of the Bankruptcy Court, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

GG.    <u>Setoffs and Recoupments</u>.  The Debtor or the Reorganized Debtor, as applicable, may but shall not be required to, setoff against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims or any nature whatsoever that the Debtor or the Reorganized Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against the Holder of such Claim.

HH.    <u>Management of the Reorganized Debtor Post Effective Date</u>.  Upon the Effective Date, the Reorganized Debtor's remaining operations necessary to carry out the Debtor's obligations under the Plan shall be managed by the Chief Restructuring Officer, who shall have the authority to make decisions on behalf of the Debtor.  The Chief Restructuring Officer has previously been employed by the Court and shall continue to serve in that capacity. Upon the Effective Date, the Debtor's Bylaws shall be deemed modified so to provide the Chief Restructuring Officer with whatever authority is necessary for him to undertake his role.  All requirements in the Debtor's Bylaws as to officers and directors shall be eliminated, and the employment of all other officers and directors of the Debtor shall be terminated as of the Effective Date. Following the Effective Date, the Chief Restructuring Officer shall be entitled to appoint one or more individuals to act on his behalf, and/or act as officers of the Debtor under his supervision, including executing documents on behalf of the Reorganized Debtor.

II.    <u>Pursuit of Avoidance Actions</u>. Following the Effective Date, the Plan Trustee shall pursue causes of action, including avoidance actions, on behalf of the Estate, and the Debtor shall execute all necessary documents to effectuate such a transfer.

<u>**ARTICLE X**</u>
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    <u>Assumption or Rejection of Executory Contracts and Leases</u>. Any executory contracts or leases classified in Class 17 shall be assumed or rejected in accordance with this Article VI, unless assumed or rejected by a separate Order of the Court entered prior to the Confirmation Date.

B.    <u>Procedure for Assuming or Rejecting Class 17 Executory Contracts and Leases</u>. The Debtor shall file with the Court the Schedule of Assumed Executory Contracts and Unexpired Leases (including the proposed Cure Claim amounts) no later than thirty (30) days prior to the scheduled Confirmation Hearing, and serve such Schedule of Assumed Executory Contracts upon the affected parties in accordance with Rules 6006 and 9014. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed, served, and actually received by the Debtor no later than fourteen (14) days after the filing of the Schedule of Assumed Executory Contracts and Unexpired Leases. Any such objections will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing, unless resolved by the parties prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim. To the extent any such dispute regarding the assumption of an Executory Contract or Unexpired Lease is not consensually resolved by the parties or otherwise resolved prior to the Effective Date, such assumption will be deemed to occur retroactively to the date of the Confirmation Hearing if approved by the Bankruptcy Court.

C.    <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>. Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Section 365(b)(l) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute between the Debtor and a counterparty to any Executory Contracts or Unexpired Leases that is not resolved between the parties regarding (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, shall be made following the entry of a Final Order resolving the dispute and approving the assumption, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective  Date. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of any one of the following: (1) amounts listed on the Debtors' Schedule of Assumed Executory Contracts and Unexpired Leases (if no objections to the Cure Claim is filed within the applicable objection period), (2) amounts agreed to by the Debtor and the applicable counterparty, or (3) amounts as ordered by the Court.

D.    <u>Claims Based on Rejection of Executory Contracts and Unexpired Leases</u>. The Debtor shall file the Schedule of Rejected Executory Contracts and Unexpired Leases no later than thirty (30) days prior to the scheduled Confirmation Hearing. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from

the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the effective date of such rejection; or (3) the Effective Date of the Plan. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, WBPC, the Estate, or its property without the need for any objection by the Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

## ARTICLE XI
## EFFECTIVE DATE OF PLAN

A.  <u>Conditions Precedent to the Effective Date</u>.  It shall be a condition to the Effective Date of the Plan that the Confirmation Order shall have been duly entered and in full force and effect, and no stay of the Confirmation Order has been entered.

B.  <u>Notice of Effective Date</u>. Upon the occurrence of the Effective Date, the Debtor shall file a notice of the occurrence of the Effective Date with the Court.

C.  <u>Alternate Sales Upon Non-Occurrence of Certain Events</u>. The following shall not prevent or be conditions to the Plan becoming effective, but instead shall require the implementation of alternate sale provisions:

      1.  In the event Southern Roots has not closed on the personal property and real estate sales described in Article V, Section B herein by September 15, 2018, the Debtor shall within 15 days thereafter file a motion to sell such assets by auction.

      2.  In the event WBPC has not (i) secured a PACA license, (ii) secured the ability to use the Watec facility for its operations, or(iii) closed on financing sufficient to acquire assets as provided herein and continue operations after the Effective Date in a manner which the Court determines to be feasible, the Debtor shall commence a sale of all remaining assets not otherwise sold under the Plan, by soliciting a stalking horse sale(s) for the sale of the Haworth Facility and the Sales Company, such stalking horse sale bid deadline to be held on or before November 1, 2018.

## ARTICLE XII
## POTENTIAL MATERIAL FEDERAL TAX CONSEQUENCES

The Debtor is a North Carolina corporation which is treated as a C corporation for federal and state tax law purposes.  Beginning with the 2018 tax year, the Debtor will pay tax on its taxable income at a maximum federal rate of 21%, and a maximum state rate of 6.9%.

The Plan contemplates that some debts may be satisfied for less than the full face amount of the claims. As a result, the Debtor will recognize cancellation of indebtedness income in an amount equal to the difference between the face amount of the debt and the payment made. Because the Debtor is in bankruptcy, Section 108(a)(1)(A) permits the Debtor to exclude the cancellation of indebtedness income from its taxable income. The Debtor will be required to reduce certain tax attributes, such as net operating loss carryforwards and basis.

The Debtor contemplates a liquidation of its assets. The Debtor will recognize gain or loss on the sale of its assets, which gain or loss will be a combination of capital and ordinary, depending on the categories of assets sold. The tax treatment of the Debtor's income and expenses from operations prior to liquidation, if any, will be consistent with the treatment thereof outside of bankruptcy under the Debtor's method of accounting for receipts and costs of this nature.

Any net operating losses remaining after the liquidation of the Debtor's business will be lost. Any tax refunds to which the Debtor is entitled will be assets of the estate.

Administrative claims will be deductible by the Debtor. Payments of principal and interest on secured or unsecured liabilities, and payments of any operating costs, will be deductible to the extent the Debtor could have deducted such payments outside of bankruptcy.

For federal income tax purposes, loan creditors who receive principal payments under the Plan generally will recognize capital gain or loss in an amount equal to the difference between the amount of the principal payments and their bases in their claim. (A creditor may have a basis in its claim which is different from the face amount of the indebtedness as a result of charge-offs, or because it acquired its claim for something other than the face amount from the original lender.) Any interest payments received by creditors under the Plan will generate ordinary income to such creditors, to the extent such amounts have not already been accrued.

A loan creditor whose debt is significantly modified will be treated as having received a new debt instrument in exchange for the old one. This will be treated as a sale or exchange of the old debt for a new instrument with a value determined under IRS rules. This may result in the recognition of capital gain or loss by the creditor in an amount equal to the difference between the value of the new instrument and the creditor's basis in the claim.

Other creditors of the Debtor who receive payments under the Plan will recognize federal taxable income in a manner consistent with their methods of accounting for receipts of this nature.

Expenses incurred by creditors in connection with the Plan, such as legal, accounting and administrative costs, should be deductible by the creditors in accordance with their methods of accounting.

To the extent creditors are subject to North Carolina income tax, their treatment for state

-27-

tax purposes will generally follow the federal treatment discussed above. The income tax treatment of creditors in states other than North Carolina is beyond the scope of this disclosure statement.

DISCLAIMER: On December 22, 2017, President Trump signed the Tax Cuts and Jobs Act of 2017 (the "Act") into law, which goes into effective January 1, 2018. Due to the numerous unknowns concerning the effects and implementation of the Act, a detailed discussion of the tax consequences of the Act to the Debtor and creditors is unknown at this time and beyond the scope of this Disclosure Statement.

CIRCULAR 230 NOTICE: To comply with requirements imposed by the United States Treasury Department and/or IRS, any information regarding any U.S. federal tax matters contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, as advice for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. A formal and thorough written tax opinion would first be required for any tax advice contained in this communication to be used to avoid tax related penalties. Please consult your own tax professional.

## ARTICLE XIII
## EFFECT OF CONFIRMATION

A.      Vesting of Property.  Notwithstanding Section 1141 of the Code, upon the Effective Date, confirmation of the Plan shall not vest any property of the Estate in the Debtor.

B.      Retention of Properties.  Except as expressly set forth in the Plan, the Debtor shall retain possession of all property both real and personal, and tangible and intangible, subject to such future use or disposition as determined by the Debtor and this Plan.

C.      Injunction.  As of the Confirmation Date, except as otherwise provided in the Plan or the Confirmation Order, all persons that have held, currently hold, or may hold a claim, equity interest, or other debt or liability that is treated pursuant to the terms of the Plan or that is otherwise enjoined pursuant to Section 1141 of the Code, are enjoined from taking any of the following actions on account of any such claims, equity interests, Debtor or liabilities, other than actions brought to enforce obligations under the Plan: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of recoupment of any kind against any debt, liability, or obligation; and/or (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation order. Notwithstanding the foregoing, the Plan does not release or waive any claims that the Debtor may have against any party in interest. This injunction shall not affect any creditor's ability to enforce rights against non-Debtor and non-Debtor property.

D.    <u>Waiver and Release</u>.  Except as expressly set forth in the Plan, confirmation shall constitute waiver and release of the right to pursue litigation and causes of action against the Debtor, which release is supported by the requirements of this Plan and covenants contained herein.

E.    <u>Binding Effect</u>.  Upon the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

F.    <u>Discharge of Claims</u>.  Except as expressly set forth in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtor or any of its assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code.

## **ARTICLE XIV**
## **DISCLAIMER**

All parties are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan or before voting on any other matter as provided for herein.

Statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the Disclosure Statement, and all exhibits annexed thereto.  The statements contained in this Disclosure Statement are made only as of the date hereof.  No assurances exist that the statements contained herein will be correct any time hereafter.

The information contained in this Disclosure Statement is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan.  No representations concerning the Debtor are authorized by the Debtor other than as set forth in this Disclosure Statement.  Any other representations or inducements made to solicit your acceptance that are not contained in this Disclosure Statement should not be relied upon by you in arriving at your decision to accept or reject the Plan.

With respect to adversary proceedings, contested matters, other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver; rather, this Disclosure Statement shall constitute statements made in connection with settlement negotiations.

This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor or any other party.  Furthermore, this Disclosure Statement shall not be construed to be conclusive advice on the legal effects, including, but not limited to the tax effects, of the Debtor's Plan of Reorganization.  You should consult your legal or tax advisor on any questions or concerns regarding the tax or other legal consequences of the Plan.

-29-

The information contained herein is not the subject of a certified audit and formal appraisals. The Debtor's records are dependent upon internal accounting methods. As a result, valuations and liabilities are estimated. Although substantial efforts have been made to be complete and accurate, the Debtor is unable to warrant or represent the full and complete accuracy of the information contained herein.

## ARTICLE XV
## ACCEPTANCE OR REJECTION OF PLAN;
## EFFECT OF REJECTION BY AN IMPAIRED CLASS

A.    <u>Each Impaired Class Entitled to Vote Separately</u>.  Each impaired class of claims shall be entitled to have the holders of claims therein vote separately as a class to accept or reject the Plan.

B.    <u>Acceptance by a Class of Creditors</u>.  Consistent with § 1126(c) of the Bankruptcy Code, and except as provided in § 1126(e) of the Bankruptcy Code, a class of claims shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds (2/3) in dollar amount and more that one-half (1/2) in number of the allowed claims of that class that have timely and properly voted to accept or reject the Plan.

C.    <u>Claims Entitled to Vote</u>.  Holders of impaired claims shall be entitled to vote if:

1.    Such claim has been filed against the Debtor in a liquidated amount or has been listed on the Debtor's schedules other than as contingent, unliquidated, or disputed, and as to which no proof of claim has been filed. The claim shall be allowed solely for the purpose of voting on the Plan in the amount in which such claim has been filed or listed on the Debtor's schedules;

2.    Such claim has been filed against the Debtor or listed on the Debtor's schedules and is the subject of an existing objection filed by the Debtor, and is temporarily allowed for voting purposes by order of the Court in accordance with Bankruptcy Rule 3018;

3.    Such claim has been filed in an undetermined amount, in which case the creditor shall not be entitled to vote unless the Debtor and the holder of the claim agree on an amount for voting purposes or the Court enters an order setting the amount of the claim that the creditor may ballot.

4.    Any entity holding two or more duplicate claims shall be entitled to vote only one claim.

D.    <u>Confirmation Hearing</u>.  The Court will set a hearing on the confirmation of the Plan to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied.

E.      <u>Acceptances Necessary to Confirm the Plan</u>.  At the hearing of confirmation of the Plan, the Court shall determine, among other things, whether the Plan has been accepted by each impaired class.  Under § 1126 of the Bankruptcy Code, an impaired class of Creditors is deemed to accept the Plan if at least two-thirds (2/3) in amount and more than one-half (1/2) in number vote to accept the Plan.  Further, unless there is unanimous acceptance of the Plan by an impaired class, the Court must also determine that class members will receive property with a value, as of the Effective Date of the Plan, that is not less than the amount that such class member would receive or retain if the Debtor were liquidated as of the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code.

F.      <u>Confirmation of Plan Without Necessary Acceptances</u>.  The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all impaired Classes.  In order to be confirmed without the requisite number of acceptances of each impaired class, the Court must find that at least one impaired class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable, to such impaired class.  In the event that any class votes against the Plan, the Debtor request and moves the Court under the provisions of the Plan entitled "Cramdown," for confirmation pursuant to the "cramdown" provisions of § 1129(b) of the Bankruptcy Code.  In connection therewith, the Debtor shall be allowed to modify the proposed treatment of the allowed claims in any class that votes against the Plan consistent with § 1129(b)(2)(A).

## ARTICLE XVI
## "CRAMDOWN" FOR IMPAIRED CREDITORS
## NOT ACCEPTING THE PLAN

In respect to any class of creditors impaired but not accepting the Plan by the requisite majority in number or two-thirds in amount, the Debtor requests the Court to find that the Plan does not discriminate unfairly and is fair and equitable in respect to each class of claims or interests that are impaired under the Plan and that the Court confirm the Plan without such acceptances by the said impaired classes.  The Debtor will also request that the Court establish a value for any assets, the value of which is in dispute between the Debtor and any secured creditor, at a valuation hearing under Section 506 of the Bankruptcy Code, to be scheduled at the same time as the hearing on confirmation of the Plan.

## ARTICLE XVII
## PAYMENTS UNDER PLAN ARE IN FULL AND FINAL
## SATISFACTION OF DEBT

Except as otherwise provided in Section 1141 of the Bankruptcy Code, or the Plan, the payments and distributions made pursuant to the Plan will be in full and final satisfaction, settlement, release, and discharge, as against the Debtor, of any and all claims against, and interests in, the Debtor, as defined in the Bankruptcy Code, including, without limitation, any Claim or Equity Interest accrued or incurred on or before the Confirmation Date, whether or not (i) a proof of claim or interest is filed or deemed filed under Section 501 of the Bankruptcy

Code, (ii) such Claim or Equity Interest is allowed under Section 501 of the Bankruptcy Code, or (iii) the holder of such Claim or Equity Interest has accepted the Plan.

## <u>ARTICLE XVIII</u>
## PROVISIONS FOR VOTING ON A PLAN

A.    <u>Creditors Allowed to Vote and Deadline.</u>  Creditors holding allowed claims are entitled to vote to accept or reject the Debtor's Plan of Reorganization.  The Court has fixed a date by which ballots upon the proposed Plan must be filed with counsel for the Debtor as an agent of the Court.  Even though a creditor may not choose to vote, or may vote against the Plan, the creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities in each class of creditors and/or is confirmed by the Court.  Creditors who fail to vote will not be counted in determining acceptance or rejection of the Plan.  Allowance of a claim or interest for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distribution under the terms of the Plan.  Any claim to which an objection has been or will be made will be allowed for distribution only after determination by the Court.  Such determination of allowed status may be made before or after the Plan is confirmed.

B.    <u>Voting Provisions.</u>  In order for the Plan to be accepted by the class of creditors holding general unsecured claims, creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in the total number of allowed claims of creditors voting on the Plan must accept the Plan.  Under certain limited circumstances more fully described in 11 U.S.C. Section 1129(b), the Court may confirm the Plan by a "cramdown" notwithstanding the rejection thereof by more than one-third (1/3) in amount or one-half (1/2) in number of the creditors voting on the Plan.  The Debtor intend to seek confirmation under 11 U.S.C. Section 1129(b) in the event any class of creditors rejects the Plan.

C.    <u>Representations Limited.</u>  No representation concerning the Debtor, particularly regarding future business operations or the value of the Debtor's assets, has been authorized by the Debtor except as set forth in this statement.  You should not rely on any other representations or inducements offered to you to secure your acceptance or decide how to vote on the Plan.  Any person making representations or inducements concerning acceptance or rejection of the Plan should be reported to counsel for the Debtor.

While every effort has been made to provide the most accurate information available, the Debtor are unable to warrant or represent that all information is without inaccuracy.  No known inaccuracies are set forth herein.  Further, much of the information contained herein consists of projections of future performance.  While every effort has been made to ensure that the assumptions are valid and that the projections are as accurate as can be made under the circumstances, the Debtor have not undertaken to certify or warrant the absolute accuracy of the projections.

No formal appraisals have been undertaken of the Debtor's property for the purpose of preparing this Disclosure Statement.  The property values that were assigned and summarized on

the Exhibits are the Debtor-in-Possession's best estimate of the values of the property as of the time of the filing of this Disclosure Statement. These values may differ from values placed on the property at the time of the filing of the petition for relief and the subsequent schedules.

## ARTICLE XIX
## ACCEPTANCE AND CONFIRMATION

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. The confirmation hearing will be scheduled at a time and place to be determined by the Bankruptcy Court. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the confirmation hearing.

At the confirmation hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include determinations by the Bankruptcy Court that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan is in the "best interests" of all Creditors; (iii) the Plan is feasible; (iv) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances; (v) the Plan and its proponent comply with various technical requirements of the Bankruptcy Code; (vi) the Debtor have proposed the Plan in good faith; (vii) any payments made or promised in connection with the Plan are subject to the approval of the Bankruptcy Court as reasonable; and (viii) the Plan provides specified recoveries for certain priority claims. The Debtor believes that all of these conditions have been or will be met prior to the Confirmation hearing.

A. <u>Classification of Claims</u>. The Bankruptcy Code requires that a Plan place each creditor's claim in a class with "substantially similar" claims. The Debtor believes that the Plan's classification of claims complies with the requirements of the Bankruptcy Code and applicable case law.

B. <u>The Best Interests Test</u>. Notwithstanding acceptance of the Plan in accordance with Section 1126 of the Bankruptcy Code, the Bankruptcy Court must find, whether or not any party in interest objects to Confirmation, that the Plan is in the best interests of the Creditors. Bankruptcy courts have generally defined "best interests" as the Bankruptcy Code's requirement that, under any Plan, each member of an impaired class of creditors must receive or retain, on account of its claim, property of a value, as of the effective date of the Plan, that is not less than the amount such creditor would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan is in the best interests of all Creditors.

To determine what the Creditors would receive if the Debtor were liquidated under chapter 7, the dollar amount that would be generated from the liquidation of the Debtor's assets in a chapter 7 liquidation case needs to be considered. The amount that would be available for the satisfaction of Claims would consist of the Debtor's interest in the net proceeds resulting from the disposition of the Estate's assets, augmented by the Debtor's interest in the cash on

hand.  The Estate's interest would be further reduced by the amount of any Secured Claims, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the termination of the Debtor's business.  These calculations are set forth in a liquidation analysis attached to this Disclosure Statement.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation.  Such costs would include the fees payable to a chapter 7 trustee, as well as those that might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such a trustee may engage to assist in the liquidation.

After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time the Case was pending under chapter 11, including compensation for the Debtor, attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor.

For the reasons discussed above, the Debtor have concluded that the Plan provides Creditors with a recovery that has a present value at least equal to the present value of the distribution that such Person would receive if the Estate were liquidated under chapter 7 of the Bankruptcy Code.

**BECAUSE THE LIQUIDATION ANALYSIS AND ANY PROJECTIONS WHICH MAY BE PROVIDED BY THE DEBTOR ARE BASED UPON A NUMBER OF ASSUMPTIONS AND ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES THAT ARE BEYOND THE DEBTOR'S CONTROL, THERE CAN BE NO ASSURANCE THAT THE LIQUIDATION VALUES WOULD, IN FACT, BE REALIZED IN THE EVENT OF A LIQUIDATION UNDER CHAPTER 7 OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY BE HIGHER OR LOWER THAN THOSE SHOWN IN THE EXHIBITS, POSSIBLY BY MATERIAL AMOUNTS.**

C.      Feasibility of the Plan.  Section 1129(a)(11) of the Bankruptcy Code requires a judicial determination that confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.  The Debtor believes that the Debtor will be able to meet their obligations under the Plan.

D.      Confirmation.  The Plan may be confirmed if the holders of impaired Classes of Claims accept the Plan.  Classes of Claims that are not impaired are deemed to have accepted the Plan.  A Class is impaired if the legal, equitable, or contractual rights attaching to the Claims or interests of that Class are modified other than by curing defaults and reinstating maturities or by full payment in cash.

The Bankruptcy Code defines acceptance of a Plan by a class of claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of allowed claims in that class. This calculation includes only those holders of claims who actually vote to accept or reject the Plan. Votes on the Plan are being solicited only from holders of Allowed Claims in impaired Classes who are expected to receive distributions.

In the event that an impaired Class does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if (i) all other requirements of Section 1129(a) of the Bankruptcy Code are satisfied, and (ii) as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. **THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS AND STRONGLY RECOMMENDS THAT ALL PARTIES ENTITLED TO VOTE CAST THEIR BALLOTS IN FAVOR OF ACCEPTING THE PLAN.** Nevertheless, the Debtor has requested that the Bankruptcy Court confirm the Plan over the rejection of any non-accepting Class in the event all other elements of Section 1129(a) of the Bankruptcy Code are satisfied.

A Plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive. The Debtor believe that, under the Plan, all holders of impaired Claims are treated in a manner that is consistent with the treatment of other holders of Claims with which any of their legal rights are intertwined. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims.

The condition that a Plan be "fair and equitable" generally requires that an impaired class that has not accepted the Plan must receive certain specified recoveries, as set forth in Section 1129(b)(2) of the Bankruptcy Code. The Debtor believes that the Plan meets the thresholds specified in this section of the Bankruptcy Code.

## ARTICLE XX
## SIMILAR TREATMENT FOR EACH CLAIM WITHIN A CLASS

The claims stated in the Plan, by modification, Court Order, or other legally appropriate manner, may be modified throughout the course of payment under the Plan. The Debtor, upon full payment as called for under the notes and deeds of trust, shall be entitled to have the note marked paid and satisfied and the deed of trust canceled as a matter of record, by the Second Creditor or Trustee, or by appropriate application to this Bankruptcy Court, and upon a showing that the full amount of the monthly payments were made by the Debtor.

## ARTICLE XXI
## RECOMMENDATION AND CONCLUSION

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST RECOVERY TO CREDITORS AND IS IN THE BEST INTEREST OF CREDITORS,**

**THEREFORE, THE DEBTOR RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

**<u>ARTICLE XXII</u>**
**OTHER SOURCES OF INFORMATION AVAILABLE**
**TO CREDITORS AND PARTIES IN INTEREST**

  Additional motions, affidavits, orders or other documentation that might be of interest to any holder of a claim against the Debtor in this proceeding are shown on the docket sheet maintained by the Clerk's office.  Copies of the docket sheet and actual items can be obtained from the office of the Clerk of the Bankruptcy Court:

Stephanie Butler, Clerk
U.S. Bankruptcy Court
P.O. Box 791
Raleigh, NC 27602
(919) 856-4752

(This space intentionally left blank.)

-36-

Respectfully submitted, this the 29th day of June, 2018.

        STUBBS & PERDUE, P.A.
        ATTORNEYS FOR DEBTOR

        s/Trawick H. Stubbs, Jr.
        TRAWICK H. STUBBS, JR.
        N.C. State Bar No. 4221
        tstubbs@stubbsperdue.com

        s/Laurie B. Biggs
        LAURIE B. BIGGS
        N.C. State Bar No. 31845
        lbiggs@stubbsperdue.com

        9208 Falls of Neuse Road, Suite 201
        Raleigh, North Carolina 27615
        TEL:   (919) 870-6258
        FAX:   (919) 870-6259

        DEBTOR

        WAYNE BAILEY, INC.

        By: _____
        Robert Sterling Cook, Chief
        Restructuring Officer

**WAYNE BAILEY, INC.**
**CASE NO. 18-00248-5-SWH**
**EXHIBIT A - LIABILITIES**

| | Clm. No. | Impairment | Amount | Notes on claims |
|---|---|---|---|---|
| **Administrative Claims** | | | | |
| Stubbs & Perdue P.A. | | | TBD | |
| Nicholls & Crampton, P.A. | | | TBD | |
| White & Allen | | | TBD | |
| International Paper | | | $ 96,004.70 | |
| Millstream Farming, LLC | | | $ - | (amt per settlement not claim) |
| Trinity Frozen Foods | | | $ 71,650.00 | duplicate of PACA claim, obj. filed |
| Carmichael Farms | 126 | | $ 840,093.44 | disputed |
| | | Total: | $ 1,007,748.14 | |
| | | | | |
| **Priority Tax Claims** | | | | |
| NC Department of Commerce | 128 | | $ 890.43 | |
| NC Department of Revenue | 112 | | $ 3,402.74 | |
| IRS | 75 | | $ 16,790.20 | |
| | | Total: | $ 21,083.37 | |
| | | | | |
| **Class 1: Ad Valorem Tax Claims** | | Unimpaired | | |
| Columbus County | 39 | | $ 57,254.11 | |
| **Class 2: Ally** | 14 | Impaired | **$ 56,097.47** | |
| **Class 3: BB&T** | 3 | Impaired | **$ 4,443.45** | |
| **Class 4: CFFC** | 58 | Impaired | **$ 1,977,695.49** | |
| **Class 5: CFG Financial Services** | 104 | Impaired | **$ 7,622,351.73** | |
| **Class 6: CNH** | 27 | Impaired | **$ 54,761.68** | |
| **Class 7: Diversified Financial** | 41 | Impaired | **$ 29,494.40** | |
| **Class 8: Hanmi Bank** | 71 | Impaired | **$ 15,001.35** | |
| **Class 9: Ruth Kissam** | | Impaired | **$ 46,830.92** | |
| **Class 10: M2 Funding** | 99 | Impaired | **$ 37,453.40** | |
| **Class 11: Millstream *et al.*** | | Impaired | | |
| Chancy, Henry & Laurie | 108 | | $ 150,395.62 | |
| Chancy, Henry & Laurie | 107 | | $ 211,237.48 | |
| Millstream Farms, Inc. | 106 | | $ 903,487.06 | |
| Millstream Farming, LLC & Seven Mile, LLC | 95 | | $ 1,959,491.18 | |
| Millstream Farming, LLC & Seven Mile, LLC | 97 | | $ 99,440.00 | |
| | | Total: | $ 3,324,051.34 | |
| | | | | |
| **Class 12: PACA Trust Claims** | | Impaired | | |
| AM-PM Carriers | 109 | | $ 2,400.00 | Obj. filed |
| Battleboro Produce Inc | 86 | | $ 77,962.00 | |
| Boyette Brothers Produce LLC | 81 | | $ 190,985.00 | Obj. filed |
| Brown, Matt | 131 | | $ 30,860.44 | Obj. filed |
| Carmichael Farms | 83 | | $ 71,800.00 | Obj. filed |
| Castellini Company | 84 | | $ 174,472.06 | Obj. filed |
| Hayes Brothers Farms | 82 | | $ 503,594.94 | Obj. filed |
| Herring, Roy | 90 | | $ 169,883.32 | Obj. filed |
| Jordan, Jerry Thomas | 76 | | $ 16,480.00 | Obj. filed |
| JMB Transport | 130 | | $ 5,500.00 | Obj. filed |
| Kornegay Family Produce | 123 | | $ 52,184.29 | Obj. filed |
| Millstream Farms | 80 | | $ 1,063,736.52 | Obj. filed |
| Powers, Jimmy | 65 | | $ 56,907.68 | Obj. filed |
| Rylan Freight Services LLC | 53 &64 | | $ 1,980.00 | Obj. filed |
| Scott Farms Inc | 87 | | $ 154,031.47 | Obj. filed |
| Southern Produce Dist. Inc. | 21 | | $ 414,828.43 | Obj. filed |
| Southern Roots LLC | 79 | | $ 1,870,411.08 | Obj. filed |
| SP Funding, LLC | 85 | | $ 1,036,212.74 | Obj. filed |
| Spring Acres | 70 | | $ 117,753.00 | |
| Trinity Frozen Foods | 88 | | $ 71,650.00 | Obj. filed |
| Tull Hill Farms | 89 | | $ 706,410.00 | Obj. filed |
| | | Total: | $ 6,790,042.97 | |

| | Clm. No. | Impairment | Amount | | Notes on claims |
|---|---|---|---|---|---|
| **Class 12(a): PNC Equip. Fin.** | 122 | | $ | 227,357.94 | filed as secured & unsecured claim |
| **Class 13: Stearns Bank** | 125 | Impaired | $ | 45,000.00 | filed as secured & unsecured claim |
| **Class 14: United Comm. Bank** | 54 | Impaired | $ | 26,205.94 | |
| **Class 15: Millstream Farms Lease** | 96 | Impaired | $ | 650,000.00 | (amt. per settlement not claim) |
| **Class 16: Trinity Frozen Foods Lease** | | Unimpaired | **Lease Assumed** | | |

| **Class 17: Leases and Contracts** | | | | |
|---|---|---|---|---|
| Alliance Funding Group, Inc | 69 | | Sizer | |
| Bank of the West | 94 | | Equipment lease | |
| BB&T (Susquehanna Comm. Fin) | 18 | | Bins | |
| Edwards Brothers Prop. LLC | | | Bins | |
| Gore & Assoc. Management | | | Bin lease | |
| Huntington Technology Finance | | | #2 Draw Refrigeration | |
| M2 Funding | 98 | | Kenan Sizer | |
| Navitas Credit Corp. | 42 | | Lease of communication equipment | |
| Toyota Commerical Finance | 32-36 | | Forklift leases | |
| Wells Fargo Vendor Financial | 117 | | 2017 Tennant Sweeper Model #S30 | |
| Wooten Land & Timber L.L.C. | | | Bins | |
| Wooten's Business Equipment | | | Equipment lease | |
| Wooten, Alice | | | Lease of land and building | |

| **Class 18: General Unsecured Creditors** | | Impaired | | | |
|---|---|---|---|---|---|
| Advance Auto Parts | | | $ | 398.67 | |
| Advantage Auto Clinton | | | $ | 2,211.39 | |
| AG Lines Inc. | | | $ | 2,352.00 | |
| Airgas USA, LLC | | | $ | 408.45 | |
| Al's Transportation & Logistic | | | $ | 2,620.00 | |
| Allegiance Retail Services, LL | | | $ | 500.00 | |
| American Express | 44 | | $ | 30,627.25 | |
| Applied Vision Works Inc. | 5 | | $ | 8,859.37 | |
| AquaPuise Systems Inc. | | | $ | 7,964.00 | |
| Armstrong Transport Group, Inc | | | $ | 2,500.00 | |
| Ascentium Capital | 105 | | $ | 90,968.92 | |
| Atlantic Coast Toyota Lift | 114 | | $ | 4,576.54 | |
| Atlantic Corporation | 66 | | $ | 20,919.23 | |
| ATMC | | | $ | 81.15 | |
| Auto Parts Express | | | $ | 154.84 | |
| Axis Capital, Inc | 51 | | $ | 31,843.30 | Motion to Reject Lease filed |
| B&B Technology & Svcs, Inc | | | $ | 1,376.29 | |
| B.J. Williamson, Inc | | | $ | 3,216.70 | |
| Ball Brokerage | | | $ | 130.00 | |
| Barbour, Shepard | | | $ | 5,800.00 | |
| Barnhill, Greg | | | $ | 29,886.40 | |
| Beckham Logistics LLC | | | $ | 3,300.00 | |
| Big Blue Store of Clinton | | | $ | 1,117.87 | |
| Blue Cross & Blue Shield of NC | | | $ | 31,977.20 | |
| Bonanza Produce, Inc. | | | $ | 63.00 | |
| Bosch Packaging Services, Inc. | | | $ | 1,847.28 | |
| Budget Printing | 16 | | $ | 2,706.15 | |
| Burch Farms | | | $ | 3,500.00 | |
| BW Tire Repair | | | $ | 3,034.46 | |
| C and T Bright Trucking | | | $ | 6,750.00 | |
| Cape Fear Propane | | | $ | 7,284.39 | |
| Carmichael Farms | 127 | | $ | 1,369,295.96 | |
| Castellini Co | 124 | | $ | 170,359.77 | (duplicate of PACA claim) |
| Category Partners, LLC | | | $ | 263.46 | |
| Charter Communications/Spectrum | 37 | | $ | 655.81 | |
| Cintas | | | $ | 92.81 | |
| Clinton Truck & Tractor, Inc | 6 | | $ | 10,294.81 | |
| CNH | 72 | | $ | 36,115.37 | Motion to Reject Lease filed |
| Coastal Group Corporation, Inc | | | $ | 308,647.70 | |
| Connecting Point | | | $ | 6,228.23 | |
| Cooperative Grading Service | | | $ | 332.10 | |
| Cousins Logistics, Inc | | | $ | 2,000.00 | |
| Cowan Systems, LLC | | | $ | 24,225.00 | |
| Cregger Company, Inc | | | $ | 19.76 | |
| CV Pilson | 17 | | $ | 3,320.00 | |
| Darden Restaurants, Inc | | | $ | 3,942.50 | |
| DAUMAR Corporation | | | $ | 5,742.00 | |
| Davis Lift Truch Svc. | 4 | | $ | 488.81 | |
| Delane's Truck Brokerage Inc. | 11 | | $ | 5,600.00 | |
| DeltaTrak | | | $ | 3,039.68 | |
| Dennis McPherson Trucking | | | $ | 1,800.00 | |

| | Clm. No. | Impairment | Amount | Notes on claims |
|---|---|---|---|---|
| DGW Forms & Systems | 15 | | $ 3,531.21 | |
| Diaston Transport, LLC | | | $ 6,056.00 | |
| Diesel Parts of Carolina, LLC | | | $ 2,370.31 | |
| Dillon Supply Company | | | $ 394.57 | |
| Dixon Farm | | | $ 28,894.99 | |
| DLC Transport | | | $ 5,600.00 | |
| Don Jordan's Portable Toilet | | | $ 3,050.00 | |
| Doreva Produce | | | $ 5,850.00 | |
| Durand-Wayland, Inc. | 9 | | $ 23,648.32 | |
| Ecolab | 57 | | $ 6,400.00 | |
| Edward Bros Properties, LLC | | | $ 6,375.00 | |
| Elliott, John D. | | | $ 3,346.47 | |
| Elliott, John D. | | | $ 50,000.00 | |
| Elliott, John D. | | | $ 54,082.93 | |
| England Logistics, Inc. | 19 | | $ 8,422.00 | |
| Fed-Ex | 59 & 60 | | $ 4,070.00 | duplicate claims filed |
| Feeding America | | | $ 4,070.35 | |
| Financial Pacific Leasing | 28 | | $ 44,117.52 | Motion to Reject Lease filed |
| First Star Logistics, LLC | | | $ 58,447.42 | |
| Frank Donio Inc | | | $ 17,890.00 | |
| Frank Horne Construction, Inc. | | | $ 609.00 | |
| Freight All Kinds, Inc. | | | $ 5,821.50 | |
| G&S Transport, LLC | | | $ 1,700.00 | |
| Gallop Farms | | | $ 1,440.00 | |
| Gay Farms | 102 | | $ 166,419.13 | |
| Giro-Pack, Inc. | | | $ 2,559.64 | |
| GlobalTranz Enterprises Inc. | 73 | | $ 38,850.00 | |
| Godwin, Mike | | | $ 12,004.00 | |
| Godwin Produce | | | $ 2,400.00 | |
| Goodwin Refrigeration | | | $ 25,041.24 | |
| Grayson Transport, LLC | | | $ 2,500.00 | |
| Green Thumb Farms | | | $ 3,108.80 | |
| Hagan Electronics, Inc. | | | $ 27,923.43 | |
| Harden Farms, Inc. | 118&119 | | $ 14,601.33 | |
| Harvey Farms | 46 | | $ 330,675.42 | |
| Harvey's Southeast-Whiteville | | | $ 4,920.00 | |
| Hayes Auto Supply Co., Inc. | | | $ 1,307.05 | |
| Hendrix Produce | 121 | | $ 8,880.00 | |
| Herald Office Supply | | | $ 3,251.97 | |
| Hi-Tech Enterprises, Inc. | | | $ 180.00 | |
| Hill, Kendall | | | $ 39,856.59 | |
| Hill, Patricia | | | $ 202,500.00 | |
| Hill, Robert | | | $ 165,000.00 | |
| Hope, Bobby | 55 | | $157,792.96 | |
| Hope, Dewayne | 56 | | $ 157,792.96 | |
| Hope, Johnny/John Hope Farms) | 48 | | $ 169,662.49 | |
| Howell, Bruce | | | $ 3,600.00 | |
| Hudson, Josh | | | $ 4,568.75 | |
| Huntington Technology Finance | | | $ 5,866.12 | |
| Ice Companies, Inc. | | | $ 412.00 | |
| Industrial Brush Corporation | | | $ 7,568.85 | |
| Industrial Power, Inc. | | | $ 34,980.51 | |
| Industrial Power, Inc. | | | $ 13,073.55 | |
| Integrity Express Logisitics | | | $ 1,750.00 | |
| Internal Revenue Service | 75 | | $ 33.47 | |
| International Paper | 22 | | $ 326,934.83 | (excludes admin claim, amt. disputed) |
| J & J Equipment Rentals Inc. | 113 | | $ 5,550.00 | filed as lease claim, should be unsecured |
| J A M Transport | | | $ 900.00 | |
| Jackson, Brent | | | $ 10,430.00 | |
| Jerome Langdon Produce | | | $ 352,349.79 | |
| John Deere Financial | 1 | | $ 8,421.73 | |
| Jones Farms | | | $ 1,400.00 | |
| Jones Motor Company, Inc. | | | $ 5,869.00 | |
| King, Blake | 47 | | $ 5,749.07 | |
| Lane's Lawn Service | 49 | | $ 11,025.00 | |
| Lane, Roger | 50 | | $ 18,419.10 | |
| Law Office of Donald K. Carrol | | | $ 2,852.10 | |
| Lawson Products, Inc. | | | $ 1,587.66 | |
| Lee, Brian | | | $ 15,928.76 | |
| Lipman - Texas, LLC | | | $ 200.00 | |
| Longship Logistics | 103 | | $ 30,703.00 | |
| LTL Logistics Inc. | | | $ 5,990.00 | |
| Maglio & Co. | | | $ 375.00 | |
| Manis Custom Builders Inc. | | | $ 12,000.00 | |
| Mann Packing Co. | | | $ 1,600.00 | |
| Mattron Transport LLC | 29 | | $ 1,360.00 | |
| McArthur Hardware | | | $ 13,283.71 | |
| McCarron & Diess | 116 | | $ 9,422.73 | |

| | Clm. No. | Impairment | Amount | Notes on claims |
|---|---|---|---|---|
| McKenzie Supply Company | | | $ 14,718.29 | |
| Medallion Transport & Logistic | | | $ 1,584.10 | |
| MidAmerica Freight Handlers | 67 | | $ 16,518.00 | |
| Midwest Food Bank | | | $ 200.00 | |
| MJE Brokerage, Inc. | | | $ 39,462.00 | |
| NC Dept. of Agriculture | 115 | | $ 332.10 | |
| NC Department of Commerce | 129 | | $ 89.04 | |
| NC Dept. of Revenue | 112 | | $ 1,957.01 | |
| N.C. State University | | | $ 150.00 | |
| N.L. Daughtry Fertilizer Co. | | | $ 1,167.00 | |
| National Logistics Service | | | $ 103,005.44 | |
| Navajo Express, Inc. | | | $ 12,372.00 | |
| NC Strawberry Festival | | | $ 700.00 | |
| Nealy, Mary Margaret Wooten | | | $ 14,366.99 | |
| Newsong Ministries | | | $ 25,000.00 | |
| Nickey Gregory Co Inc | | | $ 2,300.00 | |
| NPC | | | $ 450.00 | |
| O' Reilly Auto Parts | | | $ 644.84 | |
| Olan Dunn Farms | | | $ 9,000.13 | |
| OSI Restaurant Partners LLC | | | $ 2,500.00 | |
| Page, Sidney Jr. | | | $ 6,000.00 | |
| Palmetto Enterprise | | | $ 700.00 | |
| Palmetto Packaging & Paper | 43 | | $ 1,861.85 | |
| Pawnee Leasing Corporation | 91 | | $ 63,726.92 | Motion to Reject Lease filed |
| Pembroke Waste | 45 | | $ 11,082.60 | |
| Pickles+Transport LLC | 26 | | $ 4,500.00 | |
| Piedmont Belting Company | | | $ 1,414.51 | |
| Pinna, Johnston & Burwell | | | $ 74,050.64 | |
| Pinnacle Freight Systems | | | $ 3,000.00 | |
| Pitney Bowes Purchase Power | | | $ 595.67 | |
| Polymer Logistics, LLC | | | $ 9,216.13 | |
| PNC Equip. Fin. (Class 12(a) def.) | 122 | | $ 3,297.94 | |
| Primus Auditing Operations | | | $ 8,585.50 | |
| Progressive Sales & Marketing | 40 | | $ 5,833.89 | |
| PS Connection | 20 | | $ 9,264.00 | |
| PT Brokers | 10 | | $ 19,000.00 | |
| PVI Enterprises | | | $ 1,541.40 | |
| R&B Freight Transportation LLC | 68 | | $ 3,036.50 | |
| Rainbow Logistics, LLC | 7 | | $ 10,659.00 | |
| Rankin Truck Brokers | | | $ 2,048.00 | |
| Rapid Capital Finance | 8 | | $ 185,366.00 | |
| Raylan Freight services | 61 | | $ 1,980.00 | Duplicate claim of PACA claim filed above |
| Real Time Freight Services | | | $ 900.00 | |
| RFG Logistics | 100 | | $ 8,200.00 | |
| Rightway Brokerage LLC | | | $ 6,002.00 | |
| RJ Cargo Express, Inc. | | | $ 1,000.00 | |
| Roadrunner Transportation | | | $ 25,631.00 | |
| Robinson & Son Machine, Inc. | | | $ 3,838.69 | |
| Romark Transporation, Inc. | | | $ 1,177.00 | |
| S & S Forwarding Inc. | | | $ 13,610.00 | |
| Safety Kleen | | | $ 170.80 | |
| Salinas Trucking | 92 | | $ 2,700.00 | |
| Sampson Building Supply | | | $ 4,708.94 | |
| Sampson County | 2 | | $ 2,377.36 | |
| Savoie | 77 & 78 | | $ 134,277.00 | duplicate claims filed |
| Schuman, Paula | | | $ 55,000.00 | |
| Scotlynn Commodities Inc. | 63 | | $ 7,750.00 | |
| Scott Martin Transport, LLC | 23 | | $ 2,600.00 | |
| Sensitech, Inc. | | | $ 501.73 | |
| Simba Trucking, Inc. | | | $ 4,000.00 | |
| Singletary Small Engine | | | $ 140.12 | |
| Smith Farms | | | $ 50.00 | |
| Smith Int'l Truck Ctr | | | $ 103.60 | |
| Smith, Tyrae Edward | | | $ 13,750.00 | |
| Soles, Jimmy | | | $ 3,016.00 | |
| Southern Mark Industries LLC | 12 | | $ 11,550.50 | |
| SP Funding, LLC | 120 | | $ 1,308,385.56 | (includes PACA claim) |
| ST Freight LLC | | | $ 237,338.90 | |
| Stearns Bank | 125 | | $ 4,414.18 | |
| Stevens & Hasty Company, Inc. | | | $ 568.90 | |
| Strickland Pallets | 62 | | $ 4,300.00 | |
| Sullivan, Earl/Sullivan Farm | 111 | | $ 421,888.00 | |
| Sunteck Transport Co Inc. | | | $ 16,400.00 | |
| T&C's Services, Inc. | | | $ 1,290.00 | |
| Tennant Sales & Services Co. | | | $ 957.55 | |
| Tharrington Smith LLP | | | $ 2,282.15 | |
| The Door Man, Inc. | | | $ 2,787.35 | |
| The NY Produce Show & Conf. | | | $ 2,999.50 | |

| | Clm. No. | Impairment | Amount | Notes on claims |
|---|---|---|---|---|
| The Produce News | | | $ 3,400.00 | |
| Thompson Price & Co. | | | $ 201,335.51 | |
| Tifco Industries, Inc. | | | $ 727.91 | |
| Time Warner Cable | | | $ 1,241.68 | |
| Tire Barn Inc. | | | $ 284.12 | |
| Total Quality Logistics, LLC | 110 | | $ 57,889.25 | |
| Town of Chadbourn | | | $ 8,292.91 | |
| Toyota Industries | 30 & 31 | | Unknown | Leases rejected |
| Trinity Fresh Foods | | | $ 70,850.00 | |
| Tull Hill Farms, Inc. | | | $ 2,294,623.05 | (Excludes PACA claim) |
| Tyson, Andrew | | | $ 2,600.00 | |
| Uline | 38 | | $ 104.26 | |
| Unifirst Corp. | | | $ 140.00 | |
| United Rentals | 13 | | $ 6,848.43 | |
| Universal Truckload, Inc. | 74 | | $ 3,300.00 | |
| US Logistics, LLC | | | $ 4,000.00 | |
| Vaughn Belting Company, Inc. | 101 | | $ 2,126.97 | |
| Volm Bag Co., Inc. | 24 | | $ 19,129.29 | |
| Wellman Oil & Propane Co | 52 | | $ 23,084.77 | |
| Werner Enterprises Inc. | | | $ 20,808.00 | |
| White Falcon Solutions, Inc. | | | $ 8,000.00 | |
| Whiteville Forklift & Equip. | | | $ 10,922.46 | |
| Whiteville Janitorial Supply | | | $ 140.16 | |
| Williamson, Walton & Scott LLP | | | $ 3,895.50 | |
| Wilson International Limited | | | $ 1,957.54 | |
| Wood, J Roland | 93 | | $ 6,000.00 | |
| Wooten, Alice | | | $ 2,500.00 | |
| Wright Trans, Inc. | | | $ 468.00 | |
| Zep Manufacturing | | | $ 991.47 | |
| | | Total: | $ 10,794,663.64 | |

**WAYNE BAILEY, INC.**
**CASE NO. 18-00248-5-SWH**
**EXHIBIT B - LIQUIDATION ANALYSIS**

| | Lienholder(s) | Amt. of Lien(s) | Value | Equity |
|---|---|---|---|---|
| **REAL PROPERTY** | | | | |
| 490 Old US Hwy 74 (Haworth) | CFFC (1st-4th liens) | $ 500,000.00 | $ 2,975,000.00 | (125,000.00) |
| | Millstream Farming, LLC | $ 2,600,000.00 | | |
| | Seven Mile LLC | see above | | |
| | Henry & Laurie Chancy (7th&8th liens) | see above | | |
| | Millstream Farms, Inc. | see above | | |
| **Subtotals:** | | **$ 3,100,000.00** | **$ 2,975,000.00** | **-** |
| **PERSONAL PROPERTY** | | | | |
| Computer Equipment | CFG | $ 7,622,351.73 | $ 10,000.00 | - |
| Cash on Hand & A/R | PACA | $ 6,790,042.97 | $ 6,300,000.00 | - |
| | CFG | $ 7,622,351.73 | | |
| | Millstream | $ 2,600,000.00 | | |
| 2017 GMC Yukon EX | Ally | $ 55,945.12 | $ 47,750.00 | - |
| 2014 GMC Yukon MP | UCB | $ 26,205.94 | $ 22,525.00 | - |
| 2010 Dodge Caravan | n/a | n/a | $ 5,000.00 | 5,000.00 |
| "Sales Company" intangible assets | CFG | $ 7,622,351.73 | $ 1,000,000.00 | - |
| Equity Available to Creditors Prior to Liquidation Costs | | | $ | (120,000.00) |

Exhibit C

**as of 1/31/17 @ 8:00 am**

| Property No. | COLUMBUS COUNTY | Property Description | Liens | Date of D/T | Book/Page | Max Amt Secured | Tax Value |
|---|---|---|---|---|---|---|---|
| 1 | 329 Carter Road, Chadbourn, NC "CARTER ROAD HOUSE" | Lots 1, 2 and 3 -Cleon Worley parcel #26055 | Ruth Kissam | 11/19/2009 | 973/664 | $ 71,183.00 | $ 78,600.00 |
| 2 | 515 Porter Swamp Road, Cerro Grodo, NC "NANCE FARM" | approx 13.62 Acres Parcel #30489 | Millstream Farms, Inc. | 8/8/2008 | 937/946 | $ 500,000.00 | $ 36,300.00 |
| | | | Millstream Farms, Inc. | 2/23/2011 | 1013/985 | $ 1,400,000.00 | |
| | | | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | |
| 3 | 118 E. Kirkland St, Chadbourn, NC | M&B "Kirkland Street" Parcel #89079 | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | $ 34,800.00 |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC - 3rd mtg | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| 4 | US 74, Chadbourn, NC "WORLEY PROPERTY" | Plat 43/88 and M & B Parcel #25590 & 76282 | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | $ 57,200.00 |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| 5 | 607 N. Howard St, Chadbourn "HOWARD STREET HOUSE" | Lot 1, 16 acres Parcel #25760 | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | $ 22,700.00 |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| | | | CFG Financial Services LLC | 6/3/2016 | 1157/572 | $ 8,500,000.00 | |
| 6 | 322 E. Kirkland Street, Chadbourn, NC "ORANGE WAREHOUSE" | Lots 1-15, portion of 21, and 22-36 Graham Division Parcel #25798 | Millstream Farms, Inc. | 6/21/2002 | 695/380 | $ 1,993,265.58 | $ 427,900.00 |
| | | | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |

| Property No. | COLUMBUS COUNTY | Property Description | Liens | Date of D/T | Book/Page | Max Amt Secured | Tax Value |
|---|---|---|---|---|---|---|---|
| 7 | E. Kirkland St, Chadbourn, NC "GRAIN MARKET" | M&B Kirkland St | Millstream Farms, Inc. | 6/21/2002 | 695/380 | $ 1,993,265.58 | $ 88,100.00 |
| | | Parcel #25796 | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| 8 | 326 E. Kirkland St, Chadbourn, NC "BLUE BUILDING" | M&B Kirkland St | Millstream Farms, Inc. | 6/21/2002 | 695/380 | $ 1,993,265.58 | $ 64,400.00 |
| | | Parcel #25797 | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| | | | CFG Financial Services, LLC | 6/3/2016 | 1157/572 | $ 6,225,000.00 | |
| 9 | 1405 Joe Brown Hwy, Chadbourn, NC "RED & WHITE BLDG" | approx 3.29 acres Hwy 410 M&B | Millstream Farms, Inc. | 6/21/2002 | 695/380 | $ 1,993,265.58 | $ 98,400.00 |
| | | parcel #25085 | Millstream Farms, Inc. | 2/23/2011 | 1013/985 | $ 1,400,000.00 | |
| | | | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| 10 | Off 242, Evergreen, NC "HARRISON FARM" | APPROX 50 acres, M&B | Millstream Farms, Inc. | 8/8/2008 | 937/946 | $ 500,000.00 | $ 69,100.00 |
| | | parcel #22724 | Millstream Farms, Inc. | 2/23/2011 | 1013/985 | $ 1,400,000.00 | |
| | | | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| 11 | Off 410, Chadbourn, NC "HARRY REED PROPERTY" | Off 410 - M&B | BB&T - 1st mtg | 5/12/2003 | 736/150 | $ 125,000.00 | |
| | | parcel #24393 | Millstream Farms, Inc. | 8/8/2008 | 937/946 | $ 500,000.00 | |
| | | | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |

| Property No. | COLUMBUS COUNTY | Property Description | Liens | Date of D/T | Book/Page | Max Amt Secured | Tax Value |
|---|---|---|---|---|---|---|---|
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| 12 | 490 Old 74, Chadbourn, NC | M&B | Cape Fear Farm Credit | 8/19/2005 | 825/840 | $ 6,500,000.00 | $ 2,949,200.00 |
| | "HAWORTH FACILITY" | parcels 25079 & 80843 & 86421 | Cape Fear Farm Credit | 11/21/2011 | 1023/1 | $ 1,700,000.00 | |
| | | | Cape Fear Farm Credit | 10/18/2013 | 1071/897 | $ 2,007,000.00 | |
| | | | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 2,700,000.00 | |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| 13 | Off Carter Rd, Chadbourn ,NC Part of Worley Farm | approx 28.21 acres PB 35, Page 60 Parcel #26056 | unencumbered | | | | $ 67,600.00 |
| 14 | 5219 Haynes Lennon Hwy, Chadbourn, NC "CALLIHAN HOUSE" | approx 1.70 acres survey 820/732 Parcel 90234 | CFG Financial Services, LLC | 6/3/2016 | 1157/572 | $ 6,225,000.00 | $46,700.00 |
| 15 | 506 Joe Brown Hwy, Chadbourn, NC "LABOR CAMP" | Approx 2.08 acres Hwy 410 Parcel #77343 | Cape Fear Farm Credit | 9/30/2014 | 1094/639 | $ 999,000.00 | $ 115,700.00 |
| | | | Millstream Farming, LLC | 9/30/2014 | 1094/679 | $ 3,000,000.00 | |
| | | | Seven Mile, LLC | 9/30/2014 | 1094/712 | $ 3,000,000.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/744 | $ 154,500.00 | |
| | | | Henry & Laurie Chancy | 9/30/2014 | 1094/776 | $ 110,000.00 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/808 | $ 307,512.28 | |
| | | | Millstream Farms, Inc. | 9/30/2014 | 1094/840 | $ 1,092,487.72 | |
| | | | CFG Financial Services LLC | 6/3/2016 | 1157/572 | $ 6,225,000.00 | |

Wayne Bailey Inc.
Weekly Cash Projections
Exhibit D

| | Forecast 6/18-6/24 | Forecast 6/25-7/1 | Forecast 7/2-7/8 | Forecast 7/9-7/15 | Forecast 7/16-7/22 | Forecast 7/23-7/29 | Forecast 7/30-8/5 | Forecast 8/6-8/12 | Forecast 8/13-8/19 | Forecast 8/20-8/26 | Forecast 8/27-9/2 | Forecast 9/3-9/9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Weekly Bank Balance** | $1,471,824 | $1,379,445 | $1,534,644 | $1,614,789 | $1,731,018 | $1,808,499 | $1,846,911 | $1,982,080 | $2,088,805 | $2,272,876 | $2,361,352 | $2,405,957 |
| **Inflows:** | | | | | | | | | | | | |
| A/R Cash Received (proj 34 Day Collection) | $438,047 | $502,057 | $466,453 | $539,000 | $539,000 | $539,000 | $539,000 | $539,000 | $539,000 | $539,000 | $539,000 | $539,000 |
| Trinity Interest Payment | | $0 | | | | | $0 | | | | $0 | |
| **Total Inflows** | **$438,047** | **$502,057** | **$466,453** | **$539,000** | **$539,000** | **$539,000** | **$539,000** | **$539,000** | **$539,000** | **$539,000** | **$539,000** | **$539,000** |
| **Operating Outflows:** | | | | | | | | | | | | |
| WBI Contract/Outside Growers | $175,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Third Party Packed Potatoes | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 | $47,250 |
| Freight | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 |
| Payroll | $39,500 | $39,500 | $52,000 | $39,500 | $39,500 | $52,000 | $52,000 | $39,500 | $39,500 | $39,500 | $52,000 | $39,500 |
| Payroll Taxes | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 |
| Temp Agency | $40,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 |
| Materials and Supplies | $60,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Utilities | $3,466 | $38,223 | $18,032 | $11,877 | $3,466 | $38,223 | $18,223 | $11,032 | $1,877 | $38,223 | $18,223 | $11,032 |
| Commercial Insurance | $0 | $40,563 | $0 | $0 | $0 | $40,563 | $0 | $0 | $0 | $0 | $40,563 | $0 |
| Health Insurance | $30,000 | $0 | $0 | $0 | $30,000 | $0 | $0 | $0 | $0 | $30,000 | $0 | $0 |
| Life Insurance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,347 | $0 | $20,500 | $0 | $0 |
| Debt Service | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| Lease Payments | $28,302 | $37,051 | $27,025 | $36,145 | $28,302 | $27,025 | $27,025 | $36,145 | $28,302 | $37,051 | $27,025 | $201,145 |
| Taxes/Property and Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Accounts Payable | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| IT Contractor Consulting Fee | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Rent - Land & Building | $0 | $0 | $4,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Rent - George Wooten | $0 | $21,333 | $0 | $0 | $0 | $0 | $21,333 | $0 | $0 | $0 | $21,333 | $0 |
| **Total Operating Outflows** | **$526,518** | **$461,921** | **$386,307** | **$372,772** | **$386,518** | **$440,588** | **$403,832** | **$382,275** | **$354,929** | **$450,524** | **$444,395** | **$536,928** |
| Seed Bedding Costs | $3,907 | ($165,064) | | | | | | | | | | |
| Quarterly Fees | | $50,000 | | $50,000 | $75,000 | | | $50,000 | | | $50,000 | |
| Bankruptcy Legal Fees | | | | | | $60,000 | | | | | | |
| **Total Outflows** | **$530,425** | **$346,857** | **$386,307** | **$422,772** | **$461,518** | **$500,588** | **$403,832** | **$432,275** | **$354,929** | **$450,524** | **$494,395** | **$536,928** |
| Weekly Excess/(Shortfall) Cash | ($92,379) | $155,199 | $80,145 | $116,228 | $77,482 | $38,412 | $135,168 | $106,725 | $184,071 | $88,476 | $44,605 | $2,072 |
| **Ending Weekly Bank Balance** | **$1,379,445** | **$1,534,644** | **$1,614,789** | **$1,731,018** | **$1,808,499** | **$1,846,911** | **$1,982,080** | **$2,088,805** | **$2,272,876** | **$2,361,352** | **$2,405,957** | **$2,408,029** |
| Cash | $1,379,445 | $1,534,644 | $1,614,789 | $1,731,018 | $1,808,499 | $1,846,911 | $1,982,080 | $2,088,805 | $2,272,876 | $2,361,352 | $2,405,957 | $2,408,029 |
| AR | $2,674,078 | $2,711,022 | $2,783,569 | $2,783,569 | $2,783,569 | $2,783,569 | $2,783,569 | $2,783,569 | $2,783,569 | $2,783,569 | $2,783,569 | $2,783,569 |
| Inventory | $2,445,054 | $2,153,087 | $2,037,951 | $1,922,816 | $1,807,680 | $1,692,545 | $1,577,410 | $1,462,274 | $1,347,139 | $1,232,004 | $1,116,868 | $1,001,733 |
| Total Cash, AR, Inventory | $6,498,577 | $6,398,752 | $6,436,309 | $6,437,402 | $6,399,749 | $6,323,025 | $6,343,058 | $6,334,648 | $6,403,584 | $6,376,924 | $6,306,394 | $6,193,331 |

Seed Cut

**WAYNE BAILEY, INC.**
**CASE NO. 18-00248-5-SWH**
**EXHIBIT E - REAL PROPERTY TO BE SOLD**

| Sale No. | Property | Address | Parcel Number | Liens | Plan for Sale of Asset |
|---|---|---|---|---|---|
| 1 | Nance Farm | 515 Porter Swamp Road, Cerro Grodo, NC | Parcel #30489 | Millstream Farms, Inc. Millstream Farms, Inc. Cape Fear Farm Credit | Auction |
| 2 | Kirkland Street House | 118 E. Kirkland St, Chadbourn, NC | Parcel #89079 | Cape Fear Farm Credit Millstream Farming, LLC Seven Mile, LLC Henry & Laurie Chancy -4th-5th mtg Millstream Farms, Inc. -6th-7th mtg | Auction |
| 3 | Worley Property | US Hwy 74, Chadbourn, NC | Parcel #25590 & 76282 | Cape Fear Farm Credit Millstream Farming, LLC Seven Mile, LLC Henry & Laurie Chancy -4th-5th mtg Millstream Farms, Inc. -6th-7th mtg | Private Sale |
| 4 | Worley Property | Off Carter Road | Parcel #26056 | n/a | Private Sale |
|  | Harry Reed Property | Off Hwy 410 | Parcel #24393 | BB&T Millstream Farms, Inc. Cape Fear Farm Credit Millstream Farming, LLC Seven Mile, LLC Henry & Laurie Chancy -6th-7th mtg Millstream Farms, Inc. -8th-9th mtg | Private Sale |
| 5 | Red & White Building | 1405 Joe Brown Hwy, Chadbourn, NC | parcel #25085 | Millstream Farms, Inc. - 1st-2nd mgt Cape Fear Farm Credit | Private Sale to Southern Roots |

| Sale No. | Property | Address | Parcel Number | Liens | Plan for Sale of Asset |
|---|---|---|---|---|---|
| 6 | Harrison Farm | Off Hwy 242, Evergreen, NC | parcel #22724 | Millstream Farms, Inc. - 1st-2nd mgt<br>Cape Fear Farm Credit<br>Millstream Farming, LLC<br>Seven Mile, LLC<br>Henry & Laurie Chancy -6th-7th mtg<br>Millstream Farms, Inc. -8th-9th mtg | Private Sale to Southern Roots |
| 7 | Grain Market | E. Kirkland St, Chadbourn, NC | Parcel #25796 | Millstream Farms, Inc.<br>Cape Fear Farm Credit<br>Millstream Farming, LLC<br>Seven Mile, LLC<br>Henry & Laurie Chancy -5th-6th mtg<br>Millstream Farms, Inc. -7th-8th mtg | Private Sale to Southern Roots |
| 8 | Blue Building | 326 E. Kirkland St, Chadbourn, NC | Parcel #25797 | Millstream Farms, Inc.<br>Cape Fear Farm Credit<br>Millstream Farming, LLC<br>Seven Mile, LLC<br>Henry & Laurie Chancy -5th-6th mtg<br>Millstream Farms, Inc. -7th-8th mtg<br>CFG Financial Services | Private Sale to Southern Roots |
| 9 | Labor Camp | 506 Joe Brown Hwy, Chadbourn, NC | Parcel #77343 | Cape Fear Farm Credit<br>Millstream Farming, LLC<br>Seven Mile, LLC<br>Henry & Laurie Chancy -4th-5th mtg<br>Millstream Farms, Inc. -6th-7th mtg | Private Sale to Southern Roots |

| Sale No. | Property | Address | Parcel Number | Liens | Plan for Sale of Asset |
|---|---|---|---|---|---|
| | | | | CFG Financial Services | |
| 10 | Carter Road House | 329 Carter Road, Chadbourn, NC | Parcel #26055 | Ruth Kissam | Auction |
| 11 | Howard Street House | 607 N. Howard St, Chadbourn | Parcel #25760 | Cape Fear Farm Credit Millstream Farming, LLC Seven Mile, LLC Henry & Laurie Chancy -4th-5th mtg Millstream Farms, Inc. -6th-7th mtg CFG Financial Services | Auction |
| 12 | Haworth parcel | Portion of parcel 86421 | | Cape Fear Farm Credit - 1st-4th mtg Millstream Farming, LLC Seven Mile, LLC Henry & Laurie Chancy 7th-8th mgt Millstream Farms, Inc. - 9th-10th mgt | Private Sale |
| 13 | Orange Building | 322 E. Kirkland Street, Chadbourn, NC | Parcel #25798 | Millstream Farms, Inc. Cape Fear Farm Credit Millstream Farming, LLC Seven Mile, LLC Henry & Laurie Chancy Henry & Laurie Chancy Millstream Farms, Inc. Millstream Farms, Inc. | Private Sale to Southern Roots |

Wayne Bailey, Inc.
Case No. 18-00248-5-SWH
Exhibit F

Equipment List

John Deere 8320 -S/N P032308

Case 210 Magnum - S/N ZCRH05197

Case 125 Puma - Z8BL02027

Ford 7610 - S/N BC83579 & BC72897

Ford 5600

Massey Ferguson 135

Lull Boom Lift


8 row KMC bedder

8 row KMC bed level incorporator

8 row KMC rolling cultivator

Buffalo 6200 layby plow

8 row KMC stack fold bar with holland transplanter units

8 row KMC stack fold bar with holland transplanter units

John Deere 6 row 7300 planter

White 12 row 8000 planter

Reddick 3pt sprayer

Redick 3 pt sprayer

Agri craft 6 fl spreader - S/N 0503705

Agri craft 9 ton tender

Woods 14ft rotary cutter

Woods 14ft rotary cutter

Woods 14 ft rotary cutter

Rhino 5 ft offset mower

Hardee long reach cutter - S/N 008666

Furguson side trencher

Roto wiper 15 ft wick bar

Woods 15 ft flail mower

KMC 21 ft field cultivator

John Deere 637 disk 30ft - S/N N0063X005172

John Deere 637 disk 24ft - S/N N00637X014413

Rayne plane

Woods 10ft hyd blade

6ft box blade

John Deere hx 20 batwing mower

UFT 15ft field cultivator

4 Row bed shaper

DMI 2500 ripper 6 shank

Athens 15 tooth chisel plow

Sheppard layby sprayer

Sheppard layby sprayer

John Deere 750 Grain drill

John Deere 20ft rotary hoe

Micro band 4 row gandy applicator

4 row shop built digging plow

4 row shop built digging plow

4 row shop built digging plow

4 row shop built digging plow

Foster Easley 4 row chain digger

Peturis 1 row harvester

Peturis 1 row harvester

Peturis 1 row harvester

Peturis 1 row harvester

Strickland 2 row disk plow

Strickland seed hopper

Strickland seed hopper

Strickland seed covering machine

Strickland plastic laying machine

Strickland vac master mowing

Strickland plant cutter riding

Strickland plant cutter

Strickland plastic removal machine

Sheppard front mount and saddle mount tractor tanks

2000 gallon nitrogen tank

6000 gallon poly tank

1000 gallon nurse tank on skid

1000 gallon nurse tank on skid

1000 gallon nurse tank on skid

1500 gallon nurse tank on skid

Assorted aluminum irrigation pipe 6'4'3'2'

Amadas irrigation reel - S/N A34640

Hobbs irrigation reel

48' sand filters on trailer SS

48' sand filter on trailer fiberglass

Assorted irrigation fittings

Oval irrigation hose

Layflat irrigation hose

Plant bed trailer

Equipment trailer

Equipment trailer with ramps

Plant crates

Shop contents

Any other miscellaneous equipment in service or salvage

| Trucks | | | | | Lienholders |
|---|---|---|---|---|---|
| 1996 | International | Truck (cutoff bus) | 1HVBDAAN9TH309267 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN5RH575830 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN9RH575703 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACNXRH575841 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN8RH575885 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN8RH575823 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN2RH575901 | | N/A |
| 1995 | International | Truck (cutoff bus) | 1HVBDAAN4SH678942 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN9RH575829 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN5RH575908 | | N/A |
| 1995 | International | Truck (cutoff bus) | 1HVBDAANXSH679111 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN2RH575719 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDAAN3SH678723 | | N/A |
| 1994 | International | Truck (cutoff bus) | 1HVBDACN6RH575903 | | N/A |
| 1995 | International | Truck (cutoff bus) | 1HVBDAAN4SH679069 | | N/A |
| 1995 | International | Truck (cutoff bus) | 1HVBBAAN1SH678371 | | N/A |
| 1992 | International | Truck (cutoff bus) | 1HVBBPEN9PH487043 | | N/A |
| | Ford | Bus | | | |
| 1987 | Ford | Truck (cutoff bus) | 1FDWJ74N3HVA04950 | | N/A |
| 1998 | Ford | Truck | 1FDNF70J3WVA02922 | | N/A |
| 1986 | GMC | Truck (cutoff bus) | 1GDL7D1BXGV508050 | | N/A |
| 1991 | GMC | Truck | 1GDM7H1J9MJ513410 | | N/A |
| | | | | | |
| Big Trucks | | | | | |
| 2013 | International | Prostar Truck | | 6218 | M2 Funding |
| 2011 | International | Prostar Truck | | 65679 | River Valley Capital |
| 2013 | International | Prostar Truck | | 6291 | Stearns Bank |
| 2013 | International | Prostar Truck | | 66362 | Stearns Bank |
| 2011 | International | Prostar Truck | | 65906 | M2 Funding |
| 2013 | International | Prostar Truck | | 83587 | Stearns Bank |
| 2003 | Kenworth | Truck | 1XKTDB9X03J709494 | | N/A |
| 2005 | Freightliner | Truck | 1FUJA6DE05LN51764 | | N/A |
| 1999 | International | Truck | 2HSFHAER2XCO86843 | | N/A |
| | | | | | |
| Flatbeds | | | | | |
| 1991 | Trailmobile | | 1PTF71TH6M9004151 | | N/A |
| 1987 | Trailerberg | | 1GRAA962S174905 | | N/A |
| 1989 | Fontaine | Trailer | 13N-1482C-7-K1547435 | | N/A |
| 1997 | Fontier | Trailer | 13N1483008V1573275 | | N/A |
| 1998 | Tran | Trailer | 1TTF48203W1055611 | | N/A |
| | | | | | |
| 1985 | Brothers | Trailer | | 21746 | M2 Funding |
| 1998 | Jerry | Trailer | 4BXUN10154S306069 | | N/A |
| | | | | | |

| Reefers | | | | |
|---|---|---|---|---|
| 2013 | | | 527SR532XDM001687 | N/A |
| 2012 | | | 4BXUN10154S306069 | N/A |
| 2013 | Vanguard | Reefer | 527SR5326DM001685 | N/A |
| 2013 | | | 527SR532XDM001690 | |
| | | | | |
| Buses and Pickups | | | | |
| 1997 | Ford | Bus (40 people) | 1FDXB80C3VVA30553 | N/A |
| 1997 | Ford | Bus (40 people) | 1FDXB80C9VVA30346 | N/A |
| 2007 | GMC | Sierra | 1GTEK14C27Z590802 | N/A |
| 1994 | International | Bus (15 people) | 1HVBDACM1RH575654 | N/A |
| 1998 | Dodge | Van | 2B5WB35Z7WK133254 | N/A |
| 1994 | Dodge | Van | 2B5WB35Z4RK144801 | N/A |
| 2006 | GMC | Sierra | 1GTHK23D86F236604 | N/A |
| 2004 | GMC | Sierra | 2GTEK19V341319049 | N/A |
| 2008 | GMC | Sierra | 1GTHK23608F200216 | N/A |
| 2002 | Ford | F250 | 1FDNX21L32EB11102 | N/A |
| 2000 | Ford | F150 | 1FTZF1729YNC37541 | N/A |
| 2002 | Chevrolet | | 1GCJK33D66F182484 | N/A |

**WAYNE BAILEY, INC.**
**CASE NO. 18-00248-5-SWH**
**EXHIBIT G - ASSETS CONVEYED TO WBPC**

| Asset | Liens | Value |
|---|---|---|
| 2017 GMC Yukon, VIN 14843 | Ally | 0 |
| 2014 GMC Yukon, VIN 20444 | UCB | 0 |
| All Packing Equipment located in Haworth Facility | CFFC & Millstream | 0 |
| Haworth Facility (excluding portion of parcel 86421) | CFFC & Millstream | 0 |
| 1,250 Sweet Potato bins | Ascentium | 0 |
| 2010 Dodge Grand Caravan, VIN 3894 | N/A | $ 5,000.00 |
| Computer & Office Equipment | CFG | $ 10,000.00 |
| General Intangibles/Sales Company Assets | CFG | $ 1,000,000.00 |

Exhibit H

Wayne Bailey Inc.
Historical Income Statement
For Years 2015 - 2017

| | 2015 | 2016 | 2017 Prelim |
|---|---|---|---|
| Total Sales | 44,308,768 | 43,015,522 | 36,957,798 |
| | | | |
| Cost of Goods Sold | 37,731,206 | 35,515,911 | 34,896,096 |
| Gross Profit | 6,577,562 | 7,499,611 | 2,061,702 |
| | | | |
| Total Operating Expenses | 5,038,765 | 10,071,495 | 5,213,930 |
| | | | |
| Operating Income | 1,538,797 | (2,571,884) | (3,152,228) |
| | | | |
| Oher (Income)/Expense | (297,557) | (261,939) | (362,132) |
| Interest Expense | 1,053,990 | 1,133,402 | 969,128 |
| Loan Fees | 249,703 | 1,156,665 | 563,780 |
| Total Other (Income)/Expense | 1,006,136 | 2,028,128 | 1,170,776 |
| | | | |
| Net Income Before Taxes | 532,661 | (4,600,012) | (4,323,004) |
| | | | |
| Taxes | 0 | 0 | 0 |
| | | | |
| Net Income | 532,661 | (4,600,012) | (4,323,004) |

Wayne Bailey, Inc.
Historical Balance Sheet
Years Ending December 31 2015 - 2017

| | 2015 | 2016 | 2017 Prelim |
|---|---|---|---|
| **Current Assets** | | | |
| Cash | 526,732 | 26,526 | 167,624 |
| Accounts Receivable | 4,989,985 | 5,976,016 | 4,163,955 |
| Work in Progress (Farm Inputs) | 306,274 | 639,663 | 997,985 |
| Inventory | 10,664,171 | 8,713,560 | 4,554,865 |
| Notes Receivable - Current | 754,436 | 627,500 | 552,371 |
| Prepaid Expenses | 493,756 | 527,005 | 276,513 |
| **Total Current Assets** | 17,735,354 | 16,510,270 | 10,713,313 |
| | | | |
| **Property, Plant, & Equipment** | 5,667,701 | 5,634,928 | 6,102,656 |
| | | | |
| **Investment Stock** | 1,047,608 | 547,608 | 547,608 |
| **Unamortized Loan/Non Compete Fees** | 434,534 | 6,050 | 5,401 |
| **Cash Value of Life Insurance** | 256,108 | 328,547 | 332,776 |
| **Notes Receivable** | - | - | 2,700,000 |
| **Total Assets** | 25,141,305 | 23,027,403 | 20,401,754 |
| | | | |
| | | | |
| **Current Liabilities** | | | |
| Accounts Payable - Trade | 7,952,617 | 9,865,164 | 11,289,900 |
| Accounts Payable - Other | 265,991 | 255,633 | 256,895 |
| Cash Overdraft Liability | 1,022,604 | 938,714 | - |
| Notes Payable - Current | 10,206,443 | 10,212,540 | 10,730,975 |
| **Total Current Liabilities** | 19,447,655 | 21,272,051 | 22,277,770 |
| | | | |
| | | | |
| **Long-Term Liabilities** | | | |
| Notes Payable - Long Term Portion | 4,684,606 | 5,248,820 | 5,374,686 |
| **Total Current Liabilities** | 4,684,606 | 5,248,820 | 5,374,686 |
| | | | |
| **Stockholders' Equity** | | | |
| Capital Stock | 2,715,364 | 2,715,364 | 2,715,364 |
| Retained Earnings | (1,706,320) | (6,208,832) | (9,966,066) |
| **Total Stockholders' Equity** | 1,009,044 | (3,493,468) | (7,250,702) |
| | | | |
| | | | |
| **Total Liabilities and Stockholders' Equity** | 25,141,305 | 23,027,403 | 20,401,754 |

Exhibit I

Wayne Bailey Inc.
Weekly Cash Projections
As of June 18, 2018

| | Actual 1/22-1/28 | Actual 1/29-2/4 | Actual 2/5-2/11 | Actual 2/12-2/18 | Actual 2/19-2/25 | Actual 2/26-3/4 | Actual 3/5-3/11 | Actual 3/12-3/18 | Actual 3/19-3/25 | Actual 3/26-4/1 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Weekly Bank Balance** | $639,228 | $1,254,391 | $1,007,817 | $957,616 | $998,920 | $1,058,741 | $1,306,474 | $1,305,895 | $1,622,404 | $1,701,051 |
| **Inflows:** | | | | | | | | | | |
| A/R Cash Received (proj 34 Day Collection) | $649,502 | $531,984 | $559,183 | $560,035 | $676,014 | $797,599 | $621,462 | $832,496 | $609,206 | $466,841 |
| Trinity Interest Payment | | | | $33,750 | | | | $33,750 | | |
| **Total Inflows** | $649,502 | $531,984 | $559,183 | $593,785 | $676,014 | $797,599 | $621,462 | $866,246 | $609,206 | $466,841 |
| **Operating Outflows:** | | | | | | | | | | |
| WBI Contract/Outside Growers | $0 | $146,282 | $149,881 | $71,616 | $141,174 | $208,353 | $247,898 | $211,589 | $128,195 | $206,065 |
| Third Party Packed Potatoes | $0 | $127,000 | $85,000 | $81,000 | $115,119 | $76,600 | $25,200 | $25,800 | $51,900 | $70,387 |
| Freight | $0 | $158,873 | $57,984 | $134,054 | $80,687 | $56,822 | $101,522 | $91,714 | $99,087 | $106,717 |
| Payroll | $30,172 | $29,142 | $42,522 | $32,829 | $27,092 | $43,443 | $31,745 | $38,888 | $39,463 | $37,478 |
| Payroll Taxes | $0 | $3,340 | $46,427 | $17,363 | $11,828 | $2,727 | $32,881 | $11,448 | $0 | $25,778 |
| Temp Agency | $0 | $151,027 | $36,529 | $36,546 | $45,513 | $44,689 | $43,902 | $43,180 | $51,539 | $45,670 |
| Materials and Supplies | $0 | $85,630 | $73,542 | $55,359 | $68,766 | $85,680 | $70,520 | $69,198 | $96,093 | $43,462 |
| Utilities | $0 | $37,621 | $7,028 | $8,183 | $25,516 | $12,003 | $13,293 | $5,644 | $903 | $33,159 |
| Commercial Insurance | $0 | $0 | $40,055 | $23,423 | $40,120 | $0 | $0 | $0 | $8,262 | $0 |
| Health Insurance | $0 | $31,977 | $0 | $326 | $20,696 | $35 | $0 | $0 | $17,055 | $0 |
| Life Insurance | $0 | $155 | $3,719 | $10,347 | $659 | $1,859 | $0 | $21,246 | $155 | $0 |
| Debt Service | $0 | $0 | $12,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| Lease Payments | $0 | $0 | $45,749 | $73,212 | $23,668 | $7,488 | $22,343 | $17,786 | $22,873 | $10,610 |
| Taxes/Property and Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Accounts Payable | $4,168 | $2,566 | $8,603 | $2,592 | $9,730 | $5,547 | $3,403 | $6,820 | $10,413 | $675 |
| IT Contractor Consulting Fee | $0 | $945 | $345 | $1,632 | $1,625 | $620 | $0 | $2,426 | $622 | $0 |
| Rent - Land & Building | $0 | $4,000 | $0 | $0 | $0 | $0 | $4,000 | $0 | $0 | $0 |
| Rent - George Wooten | $0 | $0 | $0 | $0 | $0 | $0 | $21,333 | $0 | $0 | $0 |
| **Total Operating Outflows** | $34,340 | $778,558 | $609,384 | $552,482 | $616,193 | $549,865 | $622,041 | $549,737 | $530,558 | $584,001 |
| Seed Bedding Costs | | | | | | | | | | $50,860 |
| Quarterly Fees | | | | | | | | | | |
| Bankruptcy Legal Fees | | | | | | | | | | |
| **Total Outflows** | $34,340 | $778,558 | $609,384 | $552,482 | $616,193 | $549,865 | $622,041 | $549,737 | $530,558 | $634,861 |
| Weekly Excess/(Shortfall) Cash | $615,163 | ($246,574) | ($50,200) | $41,303 | $59,821 | $247,733 | ($579) | $316,509 | $78,647 | ($168,020) |
| **Ending Weekly Bank Balance** | $1,254,391 | $1,007,817 | $957,616 | $998,920 | $1,058,741 | $1,306,474 | $1,305,895 | $1,622,404 | $1,701,051 | $1,533,032 |

| | Actual 4/2-4/8 | Actual 4/9-4/15 | Actual 4/16-4/22 | Actual 4/23-4/29 | Actual 4/30-5/6 | Actual 5/7-5/13 | Actual 5/14-5/20 | Actual 5/21-5/27 | Actual 5/28-6/3 | Actual 6/4-6/10 | Actual 6/11-6/17 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | $1,533,032 | $1,817,663 | $1,973,384 | $2,138,914 | $2,194,367 | $2,180,851 | $2,129,003 | $1,952,845 | $1,779,688 | $1,655,455 | $1,539,581 |
| | $689,379 | $567,620 | $682,919 | $529,212 | $541,582 | $599,447 | $388,713 | $492,796 | $324,881 | $463,226 | $504,839 |
| | | $32,486 | | | | | | | | | |
| | **$689,379** | **$600,106** | **$682,919** | **$529,212** | **$541,582** | **$599,447** | **$388,713** | **$492,796** | **$324,881** | **$463,226** | **$504,839** |
| | $61,356 | $160,122 | $126,135 | $132,282 | $146,034 | $202,870 | $301,897 | $309,700 | $171,551 | $196,382 | $83,398 |
| | $26,600 | $51,981 | $47,400 | $32,200 | $85,162 | $75,400 | $40,800 | $34,200 | $46,750 | $54,306 | $92,992 |
| | $83,368 | $61,432 | $90,476 | $94,654 | $71,516 | $84,053 | $84,254 | $72,004 | $28,288 | $75,092 | $77,835 |
| | $50,944 | $40,676 | $37,952 | $41,063 | $51,131 | $75,807 | $37,350 | $62,803 | $62,803 | $41,771 | $50,454 |
| | $22,748 | $13,302 | $12,665 | $15,040 | $19,926 | $13,710 | $12,718 | $13,981 | $18,896 | $0 | $21,826 |
| | $50,257 | $50,086 | $40,217 | $43,577 | $42,148 | $41,068 | $24,763 | $32,996 | $31,700 | $27,401 | $38,937 |
| | $33,389 | $65,974 | $53,887 | $67,068 | $57,302 | $59,018 | $41,045 | $62,872 | $33,492 | $62,181 | $83,358 |
| | $2,732 | $14,620 | $1,877 | $31,776 | $17,214 | $12,485 | $778 | $14,621 | $38,719 | $18,873 | $6,873 |
| | $0 | $0 | $17,857 | $0 | $0 | $0 | $0 | $40,563 | $1,487 | $0 | $0 |
| | $35 | $506 | $27,645 | $0 | $35 | $538 | $0 | $9,478 | $35 | $0 | $571 |
| | $1,414 | $0 | $155 | $0 | $1,443 | $10,347 | $155 | $20,500 | | $0 | $155 |
| | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| | $22,795 | $9,254 | $21,134 | $6,796 | $30,170 | $38,163 | $9,879 | $6,679 | $7,170 | $46,982 | $12,963 |
| | $0 | $0 | $21,525 | $0 | $300 | $0 | $0 | $0 | $0 | $0 | $0 |
| | $3,928 | $14,947 | $11,450 | $5,303 | $2,543 | $16,306 | $4,257 | $1,169 | $3,470 | $3,342 | $14,629 |
| | $1,030 | $678 | $751 | $0 | $0 | $1,652 | $828 | $1,172 | $400 | $0 | $934 |
| | $4,000 | $0 | $0 | $0 | $4,000 | $0 | $0 | $0 | $0 | $4,000 | $0 |
| | $21,333 | $0 | $0 | $0 | $21,333 | $0 | $0 | $0 | $0 | $21,333 | $0 |
| | **$389,931** | **$487,578** | **$515,126** | **$473,758** | **$554,256** | **$635,418** | **$562,724** | **$664,839** | **$448,761** | **$555,665** | **$488,923** |
| | $14,818 | ($43,193) | $2,264 | | $842 | $2,876 | $2,148 | $1,114 | $352 | $23,436 | $16,858 |
| | | | | | | $13,000 | | | | | |
| | **$404,748** | **$444,385** | **$517,389** | **$473,758** | **$555,098** | **$651,294** | **$564,871** | **$665,953** | **$449,114** | **$579,101** | **$505,781** |
| | $284,631 | $155,721 | $165,530 | $55,453 | ($13,516) | ($51,848) | ($176,158) | ($173,157) | ($124,233) | ($115,874) | ($942) |
| | **$1,817,663** | **$1,973,384** | **$2,138,914** | **$2,194,367** | **$2,180,851** | **$2,129,003** | **$1,952,845** | **$1,779,688** | **$1,655,455** | **$1,539,581** | **$1,538,639** |

**WAYNE BAILEY, INC.**
**CASE NO. 18-00248-5-SWH**
**EXHIBIT J - PROJECTIONS OF INCOME AND EXPENSES FOR WBPC**

| | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | | | | | | | | |
| Net income (loss) | 47,624 | 13,900 | 51,640 | 148,129 | 179,569 | 180,663 | 185,577 | 175,088 | 183,749 | 188,696 | 178,241 | 186,936 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | | | | | | | | |
| Depreciation | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 |
| Amortization of Intangible Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Changes in operating assets and liabilities: | | | | | | | | | | | | |
| Trade accounts receivable | (2,811,648) | 0 | (1,054,368) | 1,054,368 | (351,456) | 0 | 0 | 351,456 | 0 | 0 | 351,456 | 0 |
| Inventories | (1,950,000) | (1,950,000) | (1,950,000) | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 |
| Prepaid expenses and other current assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounts Payable | 1,137,500 | 1,137,500 | 1,137,500 | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) |
| Accrued Liabilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net cash provided by / (used in) operating activities | (3,574,441) | (796,516) | (1,813,145) | 1,475,414 | 101,029 | 453,580 | 458,494 | 799,461 | 456,666 | 461,613 | 802,614 | 459,853 |
| **Cash Flows from Investing Activities** | | | | | | | | | | | | |
| Purchases of property, plant & equipment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Proceeds from disposal of equipment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net cash provided by / (used in) investing activities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Cash Flows from Financing Activities** | | | | | | | | | | | | |
| Borrowings / (repayment) of revolving debt, net | 3,574,441 | 796,516 | 1,813,145 | (1,475,414) | (101,029) | (453,580) | (458,494) | (799,461) | (456,666) | (461,613) | (802,614) | (459,853) |
| Cash Overdraft Liability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net cash provided by / (used in) financing activities | 3,574,441 | 796,516 | 1,813,145 | (1,475,414) | (101,029) | (453,580) | (458,494) | (799,461) | (456,666) | (461,613) | (802,614) | (459,853) |
| Net Increase (Decrease) in Cash | 0 | 0 | (0) | 0 | (0) | 0 | 0 | 0 | 0 | 0 | (0) | 0 |
| Cash at Beginning | 0 | 0 | 0 | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Revolver at Beginning | 0 | 3,574,441 | 4,370,957 | 6,184,103 | 4,708,689 | 4,607,659 | 4,154,079 | 3,695,586 | 2,896,125 | 2,439,460 | 1,977,847 | 1,175,233 |
| Cash at End | 0 | 0 | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Revolver at End | 3,574,441 | 4,370,957 | 6,184,103 | 4,708,689 | 4,607,659 | 4,154,079 | 3,695,586 | 2,896,125 | 2,439,460 | 1,977,847 | 1,175,233 | 715,381 |
| Available Borrowing Base | 3,419,318 | 4,589,318 | 6,602,813 | 5,369,318 | 5,260,483 | 4,870,483 | 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 |
| Net Availability | (155,123) | 218,361 | 418,710 | 660,630 | 652,824 | 716,404 | 784,897 | 913,193 | 979,859 | 1,051,472 | 1,182,920 | 1,252,773 |
| Net Liquidity (Total Cash + Net Availability) | (155,123) | 218,361 | 418,710 | 660,630 | 652,824 | 716,404 | 784,897 | 913,193 | 979,859 | 1,051,472 | 1,182,920 | 1,252,773 |

| | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 44,874 | 32,773 | 70,716 | 167,413 | 199,061 | 200,367 | 205,494 | 195,221 | 204,100 | 209,267 | 199,035 | 199,668 | 52,624 | 52,624 | 92,173 | 189,101 |
| | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (351,456) | 0 | (1,054,368) | 1,054,368 | (351,456) | 0 | 0 | 351,456 | 0 | 0 | 351,456 | 0 | (351,456) | 0 | (1,054,368) | 1,054,368 |
| | (1,950,000) | (1,950,000) | (1,950,000) | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | (1,950,000) | (1,950,000) | (1,950,000) | 650,000 |
| | 1,137,500 | 1,137,500 | 1,137,500 | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | 1,137,500 | 1,137,500 | 1,137,500 | (379,167) |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (1,116,999) | (777,644) | (1,794,068) | 1,494,697 | 120,522 | 473,283 | 478,411 | 819,593 | 477,016 | 482,184 | 823,408 | 472,584 | (1,109,249) | (757,793) | (1,772,612) | 1,516,386 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | 0 | 0 | 0 |
| | 1,116,999 | 777,644 | 1,794,068 | (1,494,697) | (120,522) | (473,283) | (478,411) | (819,593) | (477,016) | (482,184) | (58,385) | | | 629,436 | 1,772,612 | (1,516,386) |
| | 1,116,999 | 777,644 | 1,794,068 | (1,494,697) | (120,522) | (473,283) | (478,411) | (819,593) | (477,016) | (482,184) | (58,385) | | 629,436 | 629,436 | 1,772,612 | (1,516,386) |
| | 0 | 0 | 0 | 0 | 0 | 0 | (0) | 0 | 0 | 0 | 0 | 0 | (1,109,249) | (128,358) | 0 | 0 |
| | (0) | (0) | (0) | (0) | (0) | (0) | 0 | (0) | (0) | 0 | 765,022 | 472,584 | 1,237,607 | 128,358 | 629,436 | 2,402,048 |
| | 715,381 | 1,832,380 | 2,610,024 | 4,404,092 | 2,909,395 | 2,788,873 | 2,315,590 | 1,837,179 | 1,017,586 | 540,569 | 0 | 765,022 | 0 | 0 | 629,436 | 2,402,048 |
| | (0) | (0) | (0) | (0) | (0) | 0 | (0) | (0) | 540,569 | 0 | 58,385 | 1,237,607 | 128,358 | 128,358 | | 0 |
| | 1,832,380 | 2,610,024 | 4,404,092 | 2,909,395 | 2,788,873 | 2,315,590 | 1,837,179 | 1,017,586 | 540,569 | 58,385 | 765,022 | 1,237,607 | 128,358 | | 2,402,048 | 885,662 |
| | 3,419,318 | 4,589,318 | 6,602,813 | 5,369,318 | 5,260,483 | 4,870,483 | 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 | 3,419,318 | 4,589,318 | 6,602,813 | 5,369,318 |
| | 1,586,939 | 1,979,295 | 2,198,721 | 2,459,923 | 2,471,610 | 2,554,893 | 2,643,304 | 2,791,733 | 2,878,749 | 2,970,933 | 2,358,154 | 1,968,154 | 3,419,318 | 3,959,883 | 4,200,765 | 4,483,657 |
| | 1,586,939 | 1,979,295 | 2,198,721 | 2,459,923 | 2,471,610 | 2,554,893 | 2,643,304 | 2,791,733 | 2,878,749 | 2,970,933 | 3,123,176 | 3,205,760 | 3,547,676 | 3,959,883 | 4,200,765 | 4,483,657 |

| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 |
|---|---|---|---|---|---|---|---|---|
| | 220,985 | 222,528 | 227,895 | 215,124 | 215,124 | 215,124 | 199,668 | 199,668 |
| | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (351,456) | 0 | 351,456 | 351,456 | 0 | 0 | 351,456 | 0 |
| | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) | (379,167) |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 142,446 | 495,445 | 500,812 | 839,496 | 488,040 | 488,040 | 824,040 | 472,584 |
| | 0 | 0 | 0 | | | | 0 | 0 |
| | 0 | 0 | 0 | | | | 0 | 0 |
| | 0 | 0 | 0 | | | | 0 | 0 |
| | (142,446) | (495,445) | (247,771) | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (142,446) | (495,445) | (247,771) | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 253,041 | 253,041 | 488,040 | 488,040 | 824,040 | 472,584 |
| | 0 | 0 | 0 | 1,092,537 | 1,092,537 | 1,580,577 | 2,068,617 | 2,892,658 |
| | 885,662 | 743,216 | 247,771 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 253,041 | 1,092,537 | 1,580,577 | 2,068,617 | 2,892,658 | 3,365,242 |
| | 743,216 | 247,771 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 5,260,483 | 4,870,483 | 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 |
| | 4,517,267 | 4,622,712 | 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 |
| | 4,517,267 | 4,622,712 | 4,733,524 | 4,901,855 | 4,999,895 | 5,097,936 | 5,250,811 | 5,333,395 |

**WAYNE BAILEY, INC.**
**CASE NO. 18-00248-5-SWH**
**EXHIBIT K - PROJECTED BALANCE SHEET FOR WBPC**

| | Fresh Start | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash | | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounts Receivable | | 2,811,648 | 2,811,648 | 3,866,016 | 2,811,648 | 3,163,104 | 3,163,104 |
| Inventory | | 1,950,000 | 3,900,000 | 5,850,000 | 5,200,000 | 4,550,000 | 3,900,000 |
| Other Current Assets | 0 | | | | | | |
| Total Current Assets | | 4,761,648 | 6,711,648 | 9,716,016 | 8,011,648 | 7,713,104 | 7,063,104 |
| Property, Plant, & Equipment, net | 2,000,000 | 1,997,917 | 1,995,833 | 1,993,750 | 1,991,667 | 1,989,583 | 1,987,500 |
| **Total Assets** | 2,000,000 | 6,759,565 | 8,707,481 | 11,709,766 | 10,003,315 | 9,702,687 | 9,050,604 |
| **Current Liabilities** | | | | | | | |
| Accounts Payable | | 1,137,500 | 2,275,000 | 3,412,500 | 3,033,333 | 2,654,167 | 2,275,000 |
| Accrued Expenses | | | | | | | |
| Cash Overdraft Liability | | | | | | | |
| Total Current Liabilities | 0 | 1,137,500 | 2,275,000 | 3,412,500 | 3,033,333 | 2,654,167 | 2,275,000 |
| Revolving Line of Credit | | 3,574,441 | 4,370,957 | 6,184,103 | 4,708,689 | 4,607,659 | 4,154,079 |
| **Stockholders Equity** | | | | | | | |
| Capital Stock | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| Retained Earnings | | | | | 261,293 | 261,293 | 261,293 |
| Current Year Net Income/(Loss) | | 47,624 | 61,524 | 113,163 | | 179,569 | 360,232 |
| Total Stockholders Equity | 2,000,000 | 2,047,624 | 2,061,524 | 2,113,163 | 2,261,293 | 2,440,861 | 2,621,525 |
| **Total Liabilities and Stockholders Equity** | 2,000,000 | 6,759,565 | 8,707,481 | 11,709,766 | 10,003,315 | 9,702,687 | 9,050,604 |
| Interest Expense at 18% | | 53,617 | 65,564 | 92,762 | 70,630 | 69,115 | |

| | | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| Unused Commitment Fee | 30,000 | 10,106 | 6,788 | (767) | 5,380 | 5,801 |
| Total Interest Expense | | 63,723 | 72,352 | 91,994 | 76,011 | 74,916 |
| | | | | | | |
| Borrowing Base | | | | | | |
| AR at 80% | 2,249,318 | 2,249,318 | 3,092,813 | 2,249,318 | 2,530,483 | 2,530,483 |
| Inv at 60% | 1,170,000 | 2,340,000 | 3,510,000 | 3,120,000 | 2,730,000 | 2,340,000 |
| | 3,419,318 | 4,589,318 | 6,602,813 | 5,369,318 | 5,260,483 | 4,870,483 |
| | | | | | | |
| Required Need | 3,574,441 | 4,370,957 | 6,184,103 | 4,708,689 | 4,607,659 | 4,154,079 |
| Excess/(Shortfall) | (155,123) | 218,361 | 418,710 | 660,630 | 652,824 | 716,404 |

| | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 3,163,104 | 2,811,648 | 2,811,648 | 2,811,648 | 2,460,192 | 2,460,192 | 2,811,648 | 2,811,648 | 3,866,016 | 2,811,648 | 3,163,104 |
| | 3,250,000 | 2,600,000 | 1,950,000 | 1,300,000 | 650,000 | 0 | 1,950,000 | 3,900,000 | 5,850,000 | 5,200,000 | 4,550,000 |
| | 6,413,104 | 5,411,648 | 4,761,648 | 4,111,648 | 3,110,192 | 2,460,192 | 4,761,648 | 6,711,648 | 9,716,016 | 8,011,648 | 7,713,104 |
| | 1,985,417 | 1,983,333 | 1,981,250 | 1,979,167 | 1,977,083 | 1,975,000 | 1,972,917 | 1,970,833 | 1,968,750 | 1,966,667 | 1,964,583 |
| | 8,398,521 | 7,394,981 | 6,742,898 | 6,090,815 | 5,087,275 | 4,435,192 | 6,734,565 | 8,682,481 | 11,684,766 | 9,978,315 | 9,677,687 |
| | 1,895,833 | 1,516,667 | 1,137,500 | 758,333 | 379,167 | | 1,137,500 | 2,275,000 | 3,412,500 | 3,033,333 | 2,654,167 |
| | 1,895,833 | 1,516,667 | 1,137,500 | 758,333 | 379,167 | 0 | 1,137,500 | 2,275,000 | 3,412,500 | 3,033,333 | 2,654,167 |
| | 3,695,586 | 2,896,125 | 2,439,460 | 1,977,847 | 1,175,233 | 715,381 | 1,832,380 | 2,610,024 | 4,404,092 | 2,909,395 | 2,788,873 |
| | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| | 261,293 | 261,293 | 261,293 | 261,293 | 261,293 | 261,293 | 261,293 | 261,293 | 261,293 | 261,293 | 2,035,586 |
| | 545,809 | 720,897 | 904,646 | 1,093,342 | 1,271,583 | 1,458,519 | 1,503,392 | 1,536,165 | 1,606,881 | 1,774,294 | 199,061 |
| | 2,807,102 | 2,982,190 | 3,165,938 | 3,354,635 | 3,532,875 | 3,719,811 | 3,764,685 | 3,797,458 | 3,868,174 | 4,035,586 | 4,234,647 |
| | 8,398,521 | 7,394,981 | 6,742,898 | 6,090,815 | 5,087,275 | 4,435,192 | 6,734,565 | 8,682,481 | 11,684,766 | 9,978,315 | 9,677,687 |
| | 62,311 | 55,434 | 43,442 | 36,592 | 29,668 | 17,628 | 10,731 | 27,486 | 39,150 | 66,061 | 43,641 |

| 7,691 | 9,602 | 12,933 | 14,836 | 16,759 | 20,103 | 22,019 | 17,365 | 14,125 | 6,650 | 12,878 |
|---|---|---|---|---|---|---|---|---|---|---|
| 70,003 | 65,036 | 56,375 | 51,427 | 46,427 | 37,732 | 32,750 | 44,851 | 53,275 | 72,711 | 56,518 |
| 2,530,483 | 2,249,318 | 2,249,318 | 2,249,318 | 1,968,154 | 1,968,154 | 2,249,318 | 2,249,318 | 3,092,813 | 2,249,318 | 2,530,483 |
| 1,950,000 | 1,560,000 | 1,170,000 | 780,000 | 390,000 | 0 | 1,170,000 | 2,340,000 | 3,510,000 | 3,120,000 | 2,730,000 |
| 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 | 3,419,318 | 4,589,318 | 6,602,813 | 5,369,318 | 5,260,483 |
| 3,695,586 | 2,896,125 | 2,439,460 | 1,977,847 | 1,175,233 | 715,381 | 1,832,380 | 2,610,024 | 4,404,092 | 2,909,395 | 2,788,873 |
| 784,897 | 913,193 | 979,859 | 1,051,472 | 1,182,920 | 1,252,773 | 1,586,939 | 1,979,295 | 2,198,721 | 2,459,923 | 2,471,610 |

| Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 765,022 | 1,237,607 | 128,358 | 0 | 0 | 0 |
| 3,163,104 | 3,163,104 | 2,811,648 | 2,811,648 | 2,811,648 | 2,460,192 | 2,460,192 | 2,811,648 | 2,811,648 | 3,866,016 | 2,811,648 |
| 3,900,000 | 3,250,000 | 2,600,000 | 1,950,000 | 1,300,000 | 650,000 | 0 | 1,950,000 | 3,900,000 | 5,850,000 | 5,200,000 |
| 7,063,104 | 6,413,104 | 5,411,648 | 4,761,648 | 4,111,648 | 3,875,214 | 3,697,799 | 4,890,006 | 6,711,648 | 9,716,016 | 8,011,648 |
| 1,962,500 | 1,960,417 | 1,958,333 | 1,956,250 | 1,954,167 | 1,952,083 | 1,950,000 | 1,947,917 | 1,945,833 | 1,943,750 | 1,941,667 |
| 9,025,604 | 8,373,521 | 7,369,981 | 6,717,898 | 6,065,815 | 5,827,298 | 5,647,799 | 6,837,922 | 8,657,481 | 11,659,766 | 9,953,315 |
| 2,275,000 | 1,895,833 | 1,516,667 | 1,137,500 | 758,333 | 379,167 | 0 | 1,137,500 | 2,275,000 | 3,412,500 | 3,033,333 |
| 2,275,000 | 1,895,833 | 1,516,667 | 1,137,500 | 758,333 | 379,167 | 0 | 1,137,500 | 2,275,000 | 3,412,500 | 3,033,333 |
| 2,315,590 | 1,837,179 | 1,017,586 | 540,569 | 58,385 | 0 | 0 | 0 | 629,436 | 2,402,048 | 885,662 |
| 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 | 2,035,586 |
| 399,428 | 604,922 | 800,143 | 1,004,242 | 1,213,510 | 1,412,545 | 1,612,212 | 1,664,836 | 1,717,459 | 1,809,632 | 1,998,733 |
| 4,435,014 | 4,640,508 | 4,835,729 | 5,039,829 | 5,249,096 | 5,448,131 | 5,647,799 | 5,700,422 | 5,753,046 | 5,845,218 | 6,034,320 |
| 9,025,604 | 8,373,521 | 7,369,981 | 6,717,898 | 6,065,815 | 5,827,298 | 5,647,799 | 6,837,922 | 8,657,481 | 11,659,766 | 9,953,315 |
| 41,833 | 34,734 | 27,558 | 15,264 | 8,109 | 876 | 0 | 0 | 0 | 9,442 | 36,031 |

| 13,380 | 15,352 | 17,345 | 20,760 | 22,748 | 24,757 | 25,000 | 25,000 | 25,000 | 22,377 | 14,991 |
|---|---|---|---|---|---|---|---|---|---|---|
| 55,213 | 50,086 | 44,903 | 36,024 | 30,856 | 25,633 | 25,000 | 25,000 | 25,000 | 31,819 | 51,022 |
| 2,530,483 | 2,530,483 | 2,249,318 | 2,249,318 | 2,249,318 | 1,968,154 | 1,968,154 | 2,249,318 | 2,249,318 | 3,092,813 | 2,249,318 |
| 2,340,000 | 1,950,000 | 1,560,000 | 1,170,000 | 780,000 | 390,000 | 0 | 1,170,000 | 2,340,000 | 3,510,000 | 3,120,000 |
| 4,870,483 | 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 | 3,419,318 | 4,589,318 | 6,602,813 | 5,369,318 |
| 2,315,590 | 1,837,179 | 1,017,586 | 540,569 | 58,385 | 0 | 0 | 0 | 629,436 | 2,402,048 | 885,662 |
| 2,554,893 | 2,643,304 | 2,791,733 | 2,878,749 | 2,970,933 | 2,358,154 | 1,968,154 | 3,419,318 | 3,959,883 | 4,200,765 | 4,483,657 |

| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 |
|---|---|---|---|---|---|---|---|---|
| | 0 | 0 | 253,041 | 1,092,537 | 1,580,577 | 2,068,617 | 2,892,658 | 3,365,242 |
| | 3,163,104 | 3,163,104 | 3,163,104 | 2,811,648 | 2,811,648 | 2,811,648 | 2,460,192 | 2,460,192 |
| | 4,550,000 | 3,900,000 | 3,250,000 | 2,600,000 | 1,950,000 | 1,300,000 | 650,000 | 0 |
| | 7,713,104 | 7,063,104 | 6,666,145 | 6,504,185 | 6,342,225 | 6,180,265 | 6,002,850 | 5,825,434 |
| | 1,939,583 | 1,937,500 | 1,935,417 | 1,933,333 | 1,931,250 | 1,929,167 | 1,927,083 | 1,925,000 |
| | 9,652,687 | 9,000,604 | 8,601,561 | 8,437,518 | 8,273,475 | 8,109,432 | 7,929,933 | 7,750,434 |
| | 2,654,167 | 2,275,000 | 1,895,833 | 1,516,667 | 1,137,500 | 758,333 | 379,167 | 0 |
| | 2,654,167 | 2,275,000 | 1,895,833 | 1,516,667 | 1,137,500 | 758,333 | 379,167 | 0 |
| | 743,216 | 247,771 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| | 4,034,320 | 4,034,320 | 4,034,320 | 4,034,320 | 4,034,320 | 4,034,320 | 4,034,320 | 4,034,320 |
| | 220,985 | 443,513 | 671,408 | 886,532 | 1,101,655 | 1,316,779 | 1,516,446 | 1,716,114 |
| | 6,255,305 | 6,477,833 | 6,705,728 | 6,920,852 | 7,135,975 | 7,351,099 | 7,550,766 | 7,750,434 |
| | 9,652,687 | 9,000,604 | 8,601,561 | 8,437,518 | 8,273,475 | 8,109,432 | 7,929,933 | 7,750,434 |
| | 13,285 | 11,148 | 3,717 | 0 | 0 | 0 | 0 | 0 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 21,310 | 21,903 | 23,968 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| 34,595 | 33,052 | 27,684 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| | | | | | | | |
| 2,530,483 | 2,530,483 | 2,530,483 | 2,249,318 | 2,249,318 | 2,249,318 | 1,968,154 | 1,968,154 |
| 2,730,000 | 2,340,000 | 1,950,000 | 1,560,000 | 1,170,000 | 780,000 | 390,000 | 0 |
| 5,260,483 | 4,870,483 | 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 |
| | | | | | | | |
| 743,216 | 247,771 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4,517,267 | 4,622,712 | 4,480,483 | 3,809,318 | 3,419,318 | 3,029,318 | 2,358,154 | 1,968,154 |

Exhibit L

## MEDIATION SETTLEMENT AGREEMENT

This Mediation Settlement Agreement is made as of June 6, 2018 by and among Wayne Bailey, Inc. (the "Debtor"), CFG Financial Services, LLC, for itself and as administrative agent for various lender participants ("CFG"), Millstream Farming, LLC Millstream Farms, Inc., Henry and Laurie Chancy, and Seven Mile, LLC (Millstream Farming, LLC Millstream Farms, LLC, Henry and Laurie Chancy, and Seven Mile, LLC are hereinafter collectively known as "Millstream"), Southern Roots Farming Co., LLC ("Southern Roots"), George Wooten and Alice Wooten ("Wooten"), Wooten Land & Timber, LLC ("WLT"), the official committee of unsecured creditors in the Debtor's chapter 11 case (the "Committee"), SP Funding, LLC ("SP Funding"), and Wayne Bailey Produce Co., LLC ("WBPC") and collectively with the foregoing parties, the "Mediation Participants").

Pursuant to and at the conclusion of the mediation conducted on June 5-6, 2018, the Mediation Participants reached agreement on a proposed plan of orderly liquidation (the "Plan") as set forth below. In implementation of their settlement, the Mediation Participants shall work diligently and in good faith to draft and execute definitive settlement documentation that incorporates the terms hereof. This Term Sheet shall be binding upon the Mediation Participants subject to the conditions set forth below.

1.      <u>Condition Precedent to CFG's Obligations</u>. CFG shall not be bound by this Agreement if CFG has not received the requisite vote of the loan participants in favor of the Agreement and notified the Mediation Participants of this vote in writing by the close of business on June 11, 2018.

2.      <u>Cash, Inventory, and A/R</u>. The Debtor will continue to operate under the direction and control of Sterling Cook as Chief Restructuring Officer (or a substitute acceptable to CFG) and according to approved cash collateral budgets through the effective date of the Plan and timely pay its operating expenses. The Mediation Participants retain the right to object to further use of cash collateral, except the payment to Millstream of the Bin Leases, and to subsequent budgets. Substantially all inventory will be liquidated on or before confirmation, in a manner which will maximize value, and CFG and the PACA claimants will maintain their respective liens and interests on all unexpended cash, inventory, and receivables through the effective date of the Plan.

3.      <u>Asset Sales or Transfers</u>.

      a.      On the Plan's effective date, the Debtor will transfer to WBPC the following:

           i.      The Haworth facility, subject to existing liens in favor of Cape Fear Farm Credit and Millstream.

           ii.      The equipment located in the Haworth facility.

1

iii.     The Debtor's general intangibles, including but not limited to all intangible assets such as trademarks, brands, goodwill, and the "sales company" assets.

iv.     The vehicles and computer/office equipment itemized on Exhibits F and H to the Disclosure Statement.

v.     Any inventory of the Debtor remaining, which shall be purchased by WBPC at the greater of (i) book value; or (ii) market value.

b.     The Debtor will sell its farm equipment, vehicles, and remaining equipment described in the sale motion to Southern Roots pursuant to the private sale approved by the Court in open court on May 30, 2018, with the net sale proceeds to be disbursed as directed by the Court including the two valley irrigation pivots after payment to Diversified Financial from the sales proceeds.

c.     The Debtor, Wooten and WLT will sell the real estate known as the Orange (25798), Blue (25797), Green (PIN 23536), Red & White (25085), Biggs PIN 94135, 21448), Evergreen (PIN 20852), Harrison Farm (PIN 22724), Reuben (21672), the Grain Market (PIN 25796), the Oil Lot (PIN 23442), and Labor Camp (77343), together with the packing equipment located in the Orange Building, to Southern Roots for an aggregate purchase price of $1,175,000, with the net proceeds allocated and disbursed to lien holders as directed by the Court. The Mediation Parties agree to provide lien release(s) acceptable to the closing attorney for all non-Debtor property sold upon which they hold a deed of trust, regardless of the receipt of proceeds.  The $1,175,000 sales price includes the sorting line.  However, such sale price does not include the refrigerator (which is subject to a lien in favor of PNC Bank) or the sizer (which is subject to a lease in favor of Alliance Financial Group).  There will be additional consideration for such refrigerator and sizer, and neither CFG nor Millstream will assert any lien on the refrigerator or the sizer, or the proceeds thereof, as part of any sale to Southern Roots.

d.     Southern Roots shall have until September 15, 2018 to close on the sales described herein. If Southern Roots fails or is unable to timely close any sale set forth above, the Debtor shall within 15 days thereafter file a motion to sell such assets by auction, or by such other means as may be approved by the Court; provided that the Hagan Sizer lease would be assumed and assigned to WBPC.

e.     Any equipment remaining that is not transferred to WBPC as of the Effective Date will be sold. The Debtor will file a motion and conduct a public auction within 45 days of the Effective Date and distribute the net proceeds disbursed to lien holders as directed by the Court.

2

     f.    The Debtor will sell by public or private sale all of its real estate except the Haworth Facility parcel numbers 25079 and 80843 and the portion of parcel 86421 used at the Haworth Facility for wastewater purposes to be determined by a survey, according to a schedule to be determined by the Debtor and the relevant lien creditor(s). Net proceeds of sale will be paid to lienholders in the order of lien priority. In the event of a dispute as to the priority of liens on equipment, payments to creditors from sales proceeds will be determined by the Court.

     g.    On or before September 1, 2018, Wooten will sell the real estate known as the Louisiana facility and land located in Oak Grove, Louisiana, at a price approved by CFG, and the net proceeds will be paid to CFG subject to the satisfaction of senior liens and ordinary closing costs.  If the property cannot be sold by such date, CFG can elect to direct Wooten to convey such property to CFG's designee for credit as may be agreed to between Wooten and CFG, or if such credit amount cannot be agreed to, the property shall be sold at public auction.

4.    <u>PACA Claims</u>

     a.    All PACA claims shall be determined by the Court in accordance with the approved claim determination order, or resolved by the agreement of the PACA claimant and the objecting party, provided that any interested party shall receive notice of any proposed settlement and be entitled to object thereto.  All Mediation Parties reserve all rights to object to these claims, subject to the deadlines and procedures established by the claim determination order.  All PACA claimants reserve all rights with respect to the claims asserted, except as otherwise provided in Section 8.c.

     b.    Allowed PACA Claims as determined by the Court by Final Order shall be paid within 45 days of the Effective Date. In the event a Final Order has not been entered on a PACA Claim, the funds which would otherwise be paid to such PACA claimant will be held in escrow until a Final Order is entered.

5.    <u>CFG's Claim.</u>

     a.    CFG has filed a proof of claim with supporting documentation, in which CFG asserts a secured claim in the amount of $7,622,351.73, reserving the right to seek allowance of post-petition interest and attorneys' fees and costs to the extent permitted under Section 506(b).

     b.    None of the Mediation Participants shall contest or seek to subordinate or recharacterize the CFG Secured Claim, which shall be deemed an allowed claim on the Plan's effective date, conditioned upon the support of CFG to confirmation and acceptance of the Plan.

3

c.    CFG, on behalf of its loan participants, shall receive all collateral or proceeds thereof in accordance with the relative priority of its liens and subject to the payment of allowed PACA Claims and allowed administrative expense claims of professionals, as described herein as follows:

i.    As assets are liquidated as provided above, CFG shall receive the net proceeds of its collateral after payment of senior liens. All proceeds paid to CFG shall be applied (1) first, to the Petition Date claim until paid in full, and (2) second, to such post-petition interest at the non-default rate and attorney's fees as may be allowed by the Court after a determination is made as to whether CFG is over or under secured.

ii.    On the Plan's effective date, CFG will be assigned the Trinity Note and CFG shall credit its Secured Claim in the amount of $2,700,000 plus accrued but unpaid interest due thereon.

iii.    On the Plan's effective date, the Debtor shall convey the Callahan House to CFG or its designee for a credit against the Secured Claim of $46,000.

iv.    On the Plan's effective date, the Debtor shall transfer ownership of the whole and term life insurance policies to CFG. The cash value of the Transamerica policy is presently approximately $325,000.00, and CFG will credit the actual cash value at the time of assignment against the Secured Claim and assume responsibility for payment of subsequent premiums if it elects to maintain the policy in place.  In the event that Mr. Wooten passes away and CFG makes a claim against the death benefits, such death benefits would be applied against the balance of the Secured Claim outstanding at that time.

v.    In the event Millstream's PACA claim is allowed and determined to be subject to the Millstream-CFG Subordination Agreement, any payments on such PACA claim shall be made to CFG and applied against the Secured Claim.

vi.    On the Plan's effective date, all funds on deposit in the Debtor's bank accounts, including funds to be paid by WBPC to purchase any remaining inventory and all accounts receivable (upon collection) shall be applied in the following order of priority:

1.    Allowed PACA claims not otherwise subordinated.

2.    Costs of administration for Court approved professionals accrued as of such date, to the extent approved by the Court and outstanding, not to exceed the limits set forth in Section 7.c below.

4

3.      CFG Secured Claim.

vii.      On the Plan's effective date, WBPC shall execute a promissory note payable to CFG in the principal amount of $1,015,000, bearing interest at 6% per annum, payable in equal monthly installments over a term of 60 months, secured by a first lien on the general intangibles, including but not limited to all intangible assets such as trademarks, brands, goodwill, and the "sales company" assets, and all other assets conveyed to WBPC by the Debtor that they previously had a lien on (excluding any inventory purchased by WBPC on the Effective Date); provided however, the principal amount of the note shall be increased to the extent of any diminution in the aggregate value of the Debtor's cash, inventory, and accounts receivable that occurs between the date of this Agreement and the Plan's effective date (excluding any interim distributions on account of PACA Claims). In the event CFG's Secured Claim has been paid in full, and an unpaid balance remains on the note, the note shall be assigned without recourse to John C. Bircher, III, who shall act as the disbursing agent under the Plan for payments to creditors according to the priorities of the Code.

viii.      CFG shall release its lien upon the Trinity Preferred Stock, which shall be held and liquidated by the Plan Trustee and applied towards payment of allowed unsecured claims. In the event the Plan Trustee elects to liquidate the Trinity Preferred Stock, the Plan Trustee shall file a motion with the Court subject to any overbids.

ix.      On and after the Plan's effective date, the Debtor, Plan Trustee, Liquidating Trust, and/or WBPC shall cooperate in good faith and take any actions reasonably requested by CFG in connection with the consummation of this Agreement, including but not limited to the execution of any documentation necessary or appropriate to consummate the transfers and assignments contemplated above.

6.    <u>Millstream's Claims</u>.

a.      Millstream has filed a PACA claim in the amount of $1,063,736.52, which will be determined by the Court. In the event (i) Millstream has an allowed PACA Claim and (ii) CFG is unsuccessful in its subordination argument with Millstream as to its PACA Claim, payments on the Millstream PACA Claim shall be paid to Millstream. In the event that (i) Millstream Farms has an allowed PACA Claim and (ii) CFG is successful in enforcing its subordination agreement with Millstream as to its PACA claim, payments on the Millstream PACA Claim shall be paid to CFG and applied against the CFG debt. In the event this issue is litigated, the Debtor will escrow the payment due on Millstream's PACA Claim and pay the proper recipient as directed by the Court.

b.  Millstream's remaining claims shall be treated as follows:

i.  Class 15 Bin Lease.

1.  Millstream owns 55,000 sweet potato storage bins and leased the bins to Wayne Bailey pre-petition. The Bin Lease expired pre-petition. Proof of claim 96 was filed in the amount of $490,258.80 for unpaid rent, interest, and late charges. Millstream also asserts an administrative rent claim for Wayne Bailey's post-petition use of the bins. Wayne Bailey desires to purchase the bins from Millstream. Pursuant to the Bin Lease, Wayne Bailey has the option and right to purchase the bins for $160,000.00 upon satisfaction of all obligations owing under the Bin Lease. Millstream will be allowed a total claim of $650,000, including the purchase option, payable, without interest, as follows:

a.  Pay $150,000.00 at or before confirmation.

b.  Pay $25,000.00 per month for 20 months starting July 1 2018, and continuing on the first day of each month thereafter until paid in full.

2.  Upon timely payment of all payments Millstream will tender a bill of sale to the Debtor and/or WBPC as applicable.

ii.  Classes 11 and 16 Secured Claim.

1.  The total secured claim includes proofs of claims 95, 97, 106-108, and 80 (PACA Claim if and to the extent not paid as a PACA Claim to Millstream from the PACA trust fund). Claims will include interest from the petition date to the Effective Date at 10% on all claims, plus such post-petition attorneys' fees and expenses as may be allowed by the Court pursuant to § 506(b) of the Code or agreed upon between Millstream and Wayne Bailey, up to the value of the equity in the collateral, less the lease payments from Trinity received by Millstream prior to the Effective Date on account of the pre-Effective Date lease period.

2.  The subordination agreement dispute with CFG will not be resolved at this point.

3.  Millstream will retain its lien on all collateral not being sold. Secured claim remaining after sales of collateral will be paid up to

6

the value of the equity in the retained collateral determined as follows: (i) Haworth valued at $2,250,000 less the sales price for the 1 parcel to be sold; plus (ii) Watec valued at $650,000; plus (iii) the Harrison Farm valued at $44,100.00 (less any senior liens to CFFC securing debt other than their proof of claim filed in the bankruptcy case; plus (iv) the collateral assignment of the Trinity lease payments under the November 10, 2017 Equipment Lease Agreement valued at $501,839.40; plus (v) any other collateral of Millstream being retained by George & Alice Wooten and/or Wooten Land & Timber valued at Cape Fear Farm Credit's 2014 appraised value (or if none, current tax value); less (vi) any senior debt still remaining to Cape Fear Farm Credit. This balance will be paid based on a 20 year amortization, at 6.5% interest, with a five year balloon. Until all sales have been completed, Plan payments to Millstream will be based on a secured claim of $2,600,000, with a true up after all sales have been completed.  Plan payments will begin on the date which is 30 days following the Effective Date and will continue on the same day of each such month thereafter.

4.     Millstream will collect, receive, and retain the Trinity lease payments of $7,029.24, with each monthly lease payment actually received by Millstream on account of the post-Effective Date lease period being a credit on the monthly Plan payment and with Debtor paying only the balance of the monthly Plan payment as long as Trinity is making lease payments.  However, if Trinity fails to make a monthly lease payment, the Debtor is obligated to pay the full monthly Plan payment. Monthly lease payments received (either pre-Effective Date or post-Effective Date) by Millstream on account of the pre-Effective Date lease period will be applied against the Millstream debt but will not be a credit on any monthly Plan payment.   If Trinity exercises the purchase option at the end of the lease, the purchase price will be applied against the Millstream debt but will not be a credit on any monthly Plan payment. If the purchase option is not exercised, Millstream will retain its collateral assignment of the Trinity lease payments.

5.     Release of Claims. In consideration for the concessions made by Millstream in connection with the Bin Lease and the bins, among other concessions, the Plan shall provide for the release, on behalf of the Debtor and the Debtor's bankruptcy estate, of all claims against Millstream and Millstream's directors, officers, agents, attorneys and representatives. Notwithstanding the foregoing, nothing contained herein is intended to or shall require the Debtor or the Debtor's bankruptcy estate to waive any defenses or perceived defenses to the validity of Millstream's PACA claim. Upon the Effective Date, Millstream shall release the Debtor and

the Debtor's Estate of any and all claims, administrative or otherwise, it may have against the Debtor or the Debtor's estate, except as specifically contemplated in this Section entitled "Millstream's Claims."

7.      <u>Payment of Approved Fees of Professionals</u>. CFG shall agree to a limited carve-out for payment of approved professional fees incurred prior to the effective date of the Plan, subject to the following conditions:

     a.      Professional fees shall be subject to approval by the Court, and CFG shall retain all rights to object to the fees of any professionals.

     b.      Professional fees shall be paid (i) first, from prepetition retainers and unencumbered assets, including recoveries on bankruptcy causes of action, and (ii) second, at or immediately after the effective date of the confirmed plan, from cash on hand subject to the carve-out limitations.

     c.      Separate carve-outs from CFG's Collateral shall be established and shall not exceed, respectively, (i) $500,000 for Debtor's bankruptcy counsel and accountants, (ii) $50,000 for Debtor's special counsel for PACA claims, and (iii) $25,000 for the Committee's counsel, with all three limits being inclusive of amounts paid from cash collateral prior to the effective date of the Plan. The Mediation Parties shall not object to the payment of approved professional fees of $100,000.00 in July and $100,000.00 in August for Debtor's bankruptcy counsel, all subject to approval by the bankruptcy court.

     d.      CFG shall be granted a lien to the extent of any cash paid from CFG's collateral toward allowed administrative expenses upon any recoveries on causes of action pursuant to Chapter 5 of the Bankruptcy Code, net of the attorneys' fees and expenses incurred in pursuing such causes of action, for reimbursement of the carve-out amounts paid as set forth above.

8.      <u>SP Funding's Claim</u>.  SP Funding's claims shall be treated as follows:

     a.      Upon the Effective Date, the Debtor and/or the Estate shall dismiss the adversary proceeding against SP Funding, and shall be deemed to have released all claims and causes of action asserted in the adversary proceeding (whether against SP Funding or any other defendant), other than any Chapter 5 avoidance actions.

     b.      All parties shall retain all rights and defenses to the PACA Claim, claim number 85.

     c.      SP Funding shall forbear from exercising for so long as this Agreement is in effect, and shall be deemed to have released on the effective date, all rights to assert a "clawback" or other PACA Claim against CFG, any lender parties for whom CFG serves

as administrative agent, or WBPC or with respect to any sales proceeds of assets identified in this Agreement.

        d.    SP Funding shall support the Debtor's Plan that incorporates the terms of this Agreement and does not contain other provisions that materially and adversely affect its rights or interests (but SP Funding shall be authorized only to object to such other terms to the extent they materially and adversely affect its interests).

9.    <u>Release of Claims</u>.  The Plan shall provide for the release, on behalf of the Debtor and the Debtor's bankruptcy estate, of all claims against CFG individually and as administrative agent for the CFG debt, all lender-participants in the CFG loan, and CFG's directors, officers, agents, attorneys and representatives, and pending adversary proceeding against the Mediation Parties shall be dismissed on the Plan's effective date, with prejudice. This release shall include all known and unknown claims existing as of the effective date of the Plan, including bankruptcy causes of actions and any lender liability actions. The Plan shall provide that all other claims and causes of action shall be retained by the Debtor and/or the Estate, subject to Paragraph 12 below.

10.    <u>Non-Debtor Collateral and Guaranties</u>. CFG shall remain free to pursue all non-debtor collateral or guarantor(s) without interference by the Debtor and without impairment of CFG's rights and claims against such non-debtor collateral and guarantors (including, but not limited to, the recovery of post-petition interest, fees or costs not recovered from the Debtor). Anything collected from such assets shall be applied against CFG's Claim.

11.    <u>Plan Support Agreement</u>.  The Debtor shall (i) draft and submit to the Mediation Participants for review and approval an Amended Plan and Disclosure Statement, which shall contain provisions consistent with all terms and conditions set forth herein, no later than June 20, 2018, (ii) file and serve the Amended Plan and Disclosure Statement no later than June 30, 2018, (iii) request a hearing to confirm the Amended Plan be held no later than September 6, 2018; and (iv) meet the requisite collateral position as of August 1, 2018 projected in the consensual cash collateral budget agreed to by the Debtor and CFG and submitted prior to the June 20, 2018 hearing, subject to a 10% variance; provided, however, that CFG may elect to waive this condition precedent in its sole discretion. All Mediation Participants will support confirmation and vote to accept the proposed Plan, provided that the Plan conforms to the terms and conditions of this term sheet and contains no other provisions materially adverse to the Mediation Participants without their respective consent, and the Committee shall provide a letter addressed to all unsecured creditors recommending they vote to accept the Amended Plan. The Debtor's obligation to dismiss the adversary proceeding, support the allowance of the CFG claim without objection, and release claims against CFG upon the effective date is conditioned upon CFG's approval and support of the plan.

12.    <u>Additional Conditions and Provisions</u>.

a.     At least ten (10) days prior to the Plan confirmation hearing, WBPC shall secure a PACA license.

b.     At least ten (10) days prior to the Plan confirmation hearing, WBPC shall secure a firm commitment for Exit financing.

c.     At least ten (10) days prior to the Plan confirmation hearing, WBPC shall secure the ability to use the Watec facility for its operations, whether by way of a lease or ownership interest in this facility.

d.     In the event WBPC fails or is unable to satisfy the requirements above, there shall be no sale or transfer of assets to WBPC, and the Debtor will file a motion seeking authority to establish a stalking horse sale procedure for the sale of all remaining assets, with an auction to take place by November 1, 2018. The net proceeds derived from such sales shall be disbursed to lien holders as directed by the Court, and any unencumbered proceeds to the holders of allowed unsecured claims.

e.     The Plan shall provide for the creation of a Plan Trustee and/or Liquidating Trust, to be determined by the Debtor and the Committee. All Chapter 5 Claims (other than those to be released on the effective date) shall be transferred to the liquidating trust or handled by the Plan Trustee as applicable. The claims in the adversary proceeding against SP Funding shall be retained by the Debtor.    The Plan Trustee/Liquidating Trust shall be authorized to hire counsel for the committee or Debtor's counsel to handle these claims and claims objections as agreed to between these parties.  All parties in interest shall retain their rights to bring adversary proceedings and claims objections as allowed by the Code.

f.     After payment of the CFG Secured Claim in full, the WBPC promissory note shall be assigned to John C. Bircher, III, without recourse, who shall act as the disbursing agent under the Plan for payments to unsecured creditors.

g.     Collection of the outstanding accounts receivable as of the Effective Date shall be overseen by the Plan Trustee and disbursed first to allowed PACA Claims that are not subordinated, then to the costs of collecting the accounts receivable , then to CFG until the lender parties are paid in full, and then as otherwise provided in the Plan. The Debtor shall provide a list of the current outstanding accounts receivable as of the Effective Date. The Plan Trustee/Liquidating Trust shall have the right to pursue any outstanding accounts receivable not timely paid.  The Plan Trustee/Liquidating Trust shall act as the disbursing agent for these funds collected, subject to the distribution of accounts receivable set forth above.

h.     The Debtor and CFG shall agree upon a consensual cash collateral budget consistent with prior budgets approved in this case prior to June 20, 2018, including

10

projections of the Debtor's collateral position. This budget shall run through confirmation of the plan.

13.     By executing this Agreement, WLT and Wooten hereby (i) agree to cooperate with the proposed Southern Roots and Hancock real estate transactions; (ii) agree to the modifications proposed as between Millstream and the Debtor; (iii) reaffirm their guaranty agreements and/or other evidences of indebtedness, notwithstanding the proposed modifications with respect to the underlying indebtedness; and (iv) agree that, subject to the forbearance provisions set forth below, Millstream may foreclose on its real property collateral.

14.     With respect to WLT and George and Alice Wooten, Millstream hereby agrees that for so long as the Debtor/assignee is current on all of the payments (bin lease claim and secured claim) required to be paid to Millstream under the Plan, Millstream will forbear (i) through and including June 30, 2019 from filing a collection suit against WLT and Wooten and from foreclosing on any of the real property currently proposed to be sold to Hancock, (ii) through and including March 31, 2019 from foreclosing on any the real property currently proposed to be sold to Southern Roots, (iii) through and including December 31, 2018 from foreclosing on all other property to be sold by WLT and/or Wooten, excepting specifically the following property to be retained and not sold by WLT and/or Wooten:

WLT

>   No. 3 - Watec Building

>   No. 4 - Harrison Farm

George and Alice Wooten

>   No. 7 393 Kissam Lane 120.74 acres

>   No. 10 Lot on Baldwin Street

>   No. 12 160 Kissam Lane (home place)

>   No. 14 210 S Mill Street (1/2 interest)

>   Pebby's Lake, LLC property

(Signatures appear on the following pages)

The above and foregoing is accepted and agreed to by the undersigned:

Counsel:                                    Party Representatives:

                                            Wayne Bailey Inc.


_____                   _____
Trawick H. Stubbs, Jr.                      By: Robert Sterling Cook, CRO
Laurie B. Biggs

                                            CFG Financial Services, LLC, for itself
                                            and as administrative agent for its loan
                                            participants
_____                   _____
John A. Northen                             By: Bruce Roberts, President
J.P. Cournoyer

                                            Millstream Farming, LLC, Millstream
                                            Farms, Inc., and Seven Mile, LLC,
                                            Henry Chancy, and Laurie Chancy

_____                   _____
J. Michael Fields                           By: J. Michael Fields, with express
                                            approval of Annette Chancy Starling,
                                            authorized agent


                                            Southern Roots Farming Co., LLC


_____                   _____
David F. Mills                              By: Adam Wooten, Manager

_____                   _____
Jason Hendren                               George Wooten, Jr., individually and on
Rebecca Redwine                             behalf of Alice Wooten

12

Jason Hendren
Rebecca Redwine

John C. Bircher, III

Mark Amendola

Wooten Land & Timber, LLC

By: George Wooten, Manager

Unsecured Creditor's Committee of Wayne Bailey, Inc.

By: Robert Hill, Chairman  by John C Bircher III
w/ express approval of Robt. Hill, Chairman

SP Funding, LLC

By: Craig Gilmore, a Manager